No. 97-710

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 109

294 Mont. 327

982 P.2d 410

STATE OF MONTANA,

Plaintiff and Respondent,

v.

STEPHEN LEWIS BASSETT,

Defendant and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Ted O. Lympus, Judge presiding.

No

COUNSEL OF RECORD:

For Appellant:

David M. Ortley, Kalispell, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Cregg W. Coughlin, Assistant Attorney General, Helena, Montana; Thomas J. Esch, Flathead County Attorney, Kalispell, Montana

Heard: November 5, 1998

Submitted: November 19, 1999

Decided: May 24, 1999

Filed:

_____

No

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

**¶1. Stephen Lewis Bassett appeals from his conviction of criminal possession of dangerous drugs, a felony, entered by the Eleventh Judicial District Court, Flathead County, as well as the District Court's denial of his motion to suppress evidence seized from his home and to suppress his incriminating statement. We reverse and remand.**

## ISSUES

**¶2. 1. Did the District Court err in denying Bassett's motion to suppress evidence seized by a police officer during a warrantless search of his home after firefighters had reported seeing contraband in his home?**

**¶3. 2. Did the District Court err in denying Bassett's motion to suppress his incriminating statement which was the direct product of the warrantless seizure of evidence?**

## BACKGROUND

**¶4. At approximately 3:45 a.m. on October 20, 1996, the Creston Volunteer Fire Department responded to a report that Bassett's home had caught fire. His home was located on Highway 35, approximately 20 miles from Kalispell. Over fifteen firefighters arrived at the scene. Upon their arrival, they discovered that the house was completely engulfed in flames. Flames were shooting out of the front door and the first story windows.**

¶5. The firefighters were told that no one remained in the house. The fire was too intense to search for missing persons in any event. Bassett himself had sustained burn injuries on one hand, and after being treated, he left his home while the firefighters extinguished the fire.

¶6. Bassett's home was an older, wood structure and wood sawdust insulated the walls. As a result, the fire was extremely hot and difficult to extinguish. The firefighting effort continued for several hours, and the firefighters eventually removed a portion of the roof to assist in dousing the flames. Law enforcement officers were not present at the scene and did not aid in the fire suppression effort.

¶7. The firefighters did not conduct an investigation into the cause and origin of the fire. They had been told that Bassett had fallen asleep while smoking, and that he awoke when his couch was on fire. One of the volunteer firefighters, Lee Buller, testified that everything they had seen was consistent with Bassett's explanation.

¶8. Between 10:30 and 11:00 a.m. that morning, after the fire was extinguished, Buller performed what is known as "mopping up," during which he walked through the interior of Bassett's home to determine whether anything was still smoldering or whether there were any remaining hot spots. During this process he entered Bassett's bedroom in the northeast corner of the home. The bedroom was the farthest area from the origin of the fire and remained standing. Buller identified a bed, furniture, clothes and other personal items in the room.

¶9. While in Bassett's bedroom, Buller observed the inside of a closet, because the door to the closet had burned away. Inside the closet, he saw a florescent light and several plants that appeared to be marijuana plants. Buller immediately notified Fire Chief Gary Mayhew and Deputy Fire Marshall Scott Gunderson, who were also at the fire scene. The firefighters then telephoned the county sheriff's office to report what they had discovered. They left the plants in the closet.

¶10. Flathead County Deputy Sheriff Wingert arrived at Bassett's home approximately 30 to 45 minutes after receiving the report. By the time he arrived, the fire was extinguished. All the fire trucks and fire fighting equipment were gone; all the firefighters had been released; and the assistant fire marshall had installed fire line tape around Bassett's home to keep people away. The firefighters planned to return later in the day to conduct routine checks to ensure that the fire had not

reignited. Only Buller, Mayhew and Gunderson remained at the scene. They remained only because they were waiting for Wingert's arrival. Had they not been waiting for him, they, too, would have left. When Wingert arrived, they met him at his car.

¶11. Deputy Wingert testified that from the outside of Bassett's home, he could not see the closet in Bassett's bedroom. Gunderson led him to Bassett's bedroom and showed him the plants inside the closet. Wingert suspected that they were marijuana plants. He seized all the plants, some pots, the light fixtures, and some growth stimulants, including "Miracle Gro." Wingert also searched some closed drawers underneath the closet in Bassett's bedroom.

¶12. Wingert failed to obtain a search warrant before he entered Bassett's home, searched Bassett's bedroom and seized the various items. At the suppression hearing, Wingert candidly admitted that there was no pressing reason or exigency that prevented him from obtaining a search warrant.

¶13. The following day, investigators interviewed Bassett at his parents' home. Bassett waived his <u>Miranda</u> rights and agreed to speak with them. He admitted that he was growing marijuana in his home.

¶14. Subsequently, Bassett was charged by amended information with the offense of criminal production or manufacture of dangerous drugs, a felony. Bassett filed a motion requesting the District Court to suppress the evidence seized from his home on the grounds that the warrantless search violated his rights guaranteed by the Fourth Amendment to the United States Constitution, and Article II, Section 11 of the Montana Constitution. He also moved to suppress his subsequent incriminating statement on the grounds that the statement was the direct product of an unconstitutional search, and was therefore inadmissible.

¶15. After an evidentiary hearing, the District Court entered its findings, conclusions and order denying Bassett's motion. It held that the volunteer firefighters were justified in entering Bassett's home without a warrant because of the exigency of the fire, and that Buller saw the marijuana plants in plain view. It concluded that under the plain view exception to the requirement that law enforcement officials obtain a warrant prior to a search and seizure of evidence, the firefighter would have been justified in immediately seizing the plants. Relying primarily on this Court's decision

in State v. Loh (1996), 275 Mont. 460, 914 P.2d 592, and the Washington Supreme Court's decision in State v. Bell (Wash. 1987), 737 P.2d 254, the District Court concluded that the deputy sheriff lawfully entered Bassett's bedroom without a warrant and seized the various items in the closet. The court further held that Bassett no longer held a reasonable expectation of privacy in his bedroom closet, because he did not nothing to restrict entry into his home, and society would not view entry into a burned residence which was largely destroyed and open to the elements as an invasion of privacy. Finally, the District Court held that because the seizure was lawful, Bassett's motion to suppress his incriminating statement was without merit.

¶16. Pursuant to a subsequent pre-trial agreement, the State amended the information to charge Bassett with criminal possession of dangerous drugs, a felony, in violation of § 45-9-102(1), MCA. Bassett pleaded guilty, but reserved his right to appeal the District Court's denial of his suppression motion. On November 20, 1997, the District Court entered judgment against Bassett. However, it deferred the sentence for two years. Bassett now appeals.

## STANDARD OF REVIEW

¶17. The standard of review of a district court's denial of a motion to suppress is whether the court's interpretation and application of the law is correct. State v. Hubbell (1997), 286 Mont. 200, 207, 951 P.2d 971, 975 (citation omitted). We review the court's findings of fact to determine whether they are clearly erroneous and whether those findings were correctly applied as a matter of law. Hubbell, 286 Mont. at 207, 951 P.2d at 975.

## ISSUE ONE

¶18. Did the District Court err in denying Bassett's motion to suppress evidence seized by a police officer during a warrantless search of his home after firefighters had reported seeing contraband in his home?

¶19. Bassett contends that the evidence seized by the police after entering his home without a warrant should be suppressed based upon the Fourth and Fourteenth Amendments to the United States Constitution and Article II, Section 11 of the

Montana State Constitution, which protect against unlawful searches and seizures. Bassett does not contend in this case, nor could he, that the firefighters who entered his home to extinguish the fire without first obtaining a warrant did so unlawfully, nor does he dispute firefighter Buller's testimony that the plants inside the bedroom closet were seen in plain view. Instead, he questions the police officer's authority to subsequently enter his home solely to conduct a search and seizure. He argues that under the plain view exception to the warrant requirement as set forth in State v. Loh, (1996), 275 Mont. 460, 914 P.2d 592, an essential predicate is that the police officer must be lawfully at the place from which he can see the evidence. In this case, he contends that the police officer had no lawful reason for entering his home, and thus the plain view doctrine does not apply. Bassett further insists that the firefighters' prior lawful entry into his home and subsequent observation of the evidence in his bedroom closet did not justify the police officer's warrantless entry. Contrary to the District Court's conclusion, he maintains that victims and owners of fire-damaged property retain reasonable privacy expectations in their home, and that absent an exigent circumstance, the police were required to first obtain a warrant.

¶20. The State disagrees with Bassett's position. It contends that because the firefighters were properly on the premise and saw the marijuana plants in plain view, Bassett did not have a reasonable expectation of privacy in the plants located in his bedroom closet. Because Bassett did not have a constitutional right to privacy, there was no search and seizure. See State v. Scheetz (1997), 286 Mont. 41, 51, 950 P.2d 722, 728. The State further urged at oral argument that once a person has lost privacy rights due to a fire, the person can regain "some measures" of his privacy only if the person takes steps to prevent re-entry into the home, such as by returning to the scene of the fire and keeping law enforcement officers off the premises or by boarding up the home. Finally, relying primarily on Loh and Bell, the State also argues that the fact that the seizure was made by the police rather than the firefighters is insignificant. Once a home has been lawfully invaded by firefighters, a separate state agency such as the police may step into the shoes of the firefighters and seize evidence that the firefighters themselves would have been justified in seizing.

¶21. The sole issue is thus whether the police officer was justified to subsequently enter Bassett's home solely to conduct a search and seizure. Resolution of this issue requires this Court to answer two separate, but related questions. First, we must address whether Bassett retained a reasonable expectation of privacy to his home

and in particular to his bedroom closet after the firefighters entered his home and subsequently viewed the plants. If he did, we must next determine whether the police officer was nevertheless justified in searching and seizing the evidence in the closet by an exception to the requirement that the police first obtain a warrant.

A. <u>Reasonable Expectation of Privacy</u>

¶22. The Fourth Amendment to the United States Constitution provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

¶23. When analyzing search and seizure questions that specially implicate the right of privacy under Montana's Constitution, we consider and address both Sections 10 and 11 of Article II of the Montana Constitution. State v. Siegal (1997), 281 Mont. 250, 264-65, 934 P.2d 176, 184, <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> State v. Kuneff, 1998 MT 287, 55 St.Rep. 1173, 970 P.2d 556. Article II, Sections 10 and 11 of the Montana Constitution provide:

Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

¶24. To determine the threshold question of whether there has been an unlawful government intrusion into one's privacy, this Court looks to the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state's intrusion. <u>Hubbel</u>, 286 Mont. at 208, 951 P.2d at 975-76 (citing <u>Scheetz</u>,

**286 Mont. at 48, 950 P.2d at 726).**

**¶25. We begin our analysis by noting that time and time again, both this Court and the United States Supreme Court have held that warrantless searches conducted inside a home are *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." Katz v. United States (1967), 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576, 585. See also Hubbel, 286 Mont. at 212, 951 P.2d at 978 (citing State v. Rushton (1994), 264 Mont. 248, 257, 870 P.2d 1355, 1361).**

**¶26. It is equally well-settled that a person retains that reasonable privacy interest in his home even when it has been damaged by fire. In Michigan v. Tyler (1978), 436 U. S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486, the Supreme Court held that an owner retained an expectation of privacy in his furniture store, even though the premises had been badly burned. The Court stated:**

[The proposition] that innocent fire victims inevitably have no protectible expectations of privacy in whatever remains of their property -- is contrary to common experience. People may go on living in their homes or working in their offices after a fire. Even when that is impossible, private effects often remain on the fire-damaged premises. The petitioner may be correct in the view that most innocent fire victims are treated courteously and welcome inspections of their property to ascertain the origin of the blaze, but "even if true, [this contention] is irrelevant to the question whether the . . . inspection is reasonable within the meaning of the Fourth Amendment." Once it is recognized that innocent fire victims retain the protection of the Fourth Amendment, the rest of the petitioner's argument unravels.

Tyler, 436 U.S. at 506, 98 S.Ct. at 1948, 56 L.Ed.2d at 495-96 (internal citations omitted).

**¶27. In Tyler, the Supreme Court concluded that entry to fight a fire requires no warrant, and that officials may remain in a building for a reasonable time to investigate the cause of the blaze. But if the officials want to conduct additional entries to investigate the cause of the fire, they must obtain a warrant pursuant to the procedures governing administrative searches. Once the investigators find probable cause to believe that arson has occurred, however, the investigators cannot obtain further access to gather evidence for a criminal investigation without obtaining a warrant based upon the traditional showing of probable cause. Tyler, 436 U.S. at 511-12, 98 S.Ct. at 1951, 56 L.Ed.2d at 500. See also Michigan v. Clifford (1984), 464 U.S.**

287, 104 S.Ct. 641, 78 L.Ed.2d 477 (plurality opinion) (reaffirming that persons retain a reasonable privacy interest in their fire-damaged home).

¶28. <u>Tyler</u> and its progeny involved situations where the fire officials themselves re-entered the burned premises to investigate the cause of the fire. At issue in this case is the lawfulness of a second agency entering the premises solely to seize evidence of a crime unrelated to the fire investigation. Although this Court has not yet addressed whether a warrant is required in such a circumstance, other jurisdictions have. In support of its argument that a warrant is not required, the State cites <u>Bell</u>, which this Court cited with approval in our discussion of the plain view doctrine in <u>Loh</u>. See <u>Loh</u>, 275 Mont. at 474, 914 P.2d at 600.

¶29. In <u>Bell</u>, after the firefighters had extinguished a fire, they discovered a marijuana growing operation in the attic of Bell's home while checking to make sure that there were no remaining smoking embers. <u>Bell</u>, 737 P.2d at 256. The assistant marshall left the residence to attend to other duties, but instructed the firefighters to remain at the scene. The assistant marshall then telephoned a deputy prosecutor, who advised him to confiscate the evidence. <u>Bell</u>, 737 P.2d at 256. Upon returning to the scene, the assistant marshall telephoned a deputy sheriff to assist in the seizure. A "human chain" of sheriff's officers and firefighters removed the evidence over the course of approximately one hour. <u>Bell</u>, 737 P.2d at 256. Neither the firefighters nor the sheriff's officers obtained a search warrant. <u>Bell</u>, 737 P.2d at 255-56.

¶30. Subsequently, the prosecution charged Bell with possession of marijuana, but the case was dismissed after the trial court suppressed the evidence. The intermediate court of appeals reversed, and on appeal, the Washington Supreme Court affirmed the reversal and remanded the case for a trial. On appeal to the Washington Supreme Court, Bell contended, *inter alia*, that the sheriff's officers needed a warrant to enter Bell's home and seize the contraband, because they constituted a separate state agency from the firefighters. <u>Bell</u>, 737 P.2d at 256.

¶31. The Washington Supreme Court rejected Bell's argument. It held that a warrant was not required because after the firefighters were legitimately on the premises, "the defendant no longer [had] a reasonable expectation of privacy for that area of the residence where one officer [was] already present." <u>Bell</u>, 737 P.2d at 259. The <u>Bell</u> court also concluded that the entry by the sheriff's officers did not constitute a second invasion. Instead, the officers merely "step[ped] into the shoes" of the

firefighters and completed what the firefighters themselves were authorized to do. <u>Bell</u>, 737 P.2d at 259.

¶32. In another case cited by the State, Mazen v. Seidel (Ariz. 1997), 940 P.2d 923, the Arizona Supreme Court reached a similar conclusion. In that case, the firefighters entered Mazen's storage unit to extinguish a fire and discovered an elaborate marijuana grow operation. The firefighters telephoned the police, who arrived while the firefighters were cleaning up. <u>Mazen</u>, 940 P.2d at 924. After the firefighters had left and the arson investigator arrived, the police officers and detectives from the Drug Enforcement Bureau seized the contraband. They did not obtain a warrant. <u>Mazen</u>, 940 P.2d at 924.

¶33. The Arizona Court of Appeals held that the seized evidence should have been suppressed, but, in a split decision, the Arizona Supreme Court reversed. It agreed with the Washington Supreme Court's decision in <u>Bell</u> and held that Mazen no longer had an expectation to privacy once the firefighters were legally present. Like the <u>Bell</u> court, it, too, held that the police could "step into the shoes" of the firefighters to seize evidence that the firefighters themselves could lawfully move. <u>Mazen</u>, 940 P.2d at 927.

¶34. Unlike the Washington Supreme Court in <u>Bell</u>, however, the Arizona Supreme Court in <u>Mazen</u> placed strict limits on the right of the police to conduct such a search and seizure. It held that the police officers who responded to the firefighters' call were limited in their search "by both spatial and temporal boundaries of the firefighters' entry, presence, and plain-view discovery." <u>Mazen</u>, 940 P.2d at 930. In other words, the police officers could lawfully enter the premise only while the firefighters were still on the scene performing their customary work, and they could search only the physical boundaries of the areas in which the firefighters were working and seize only the contraband that was in plain view. <u>Mazen</u>, 940 P.2d at 930.

¶35. At least one court has reached the opposite conclusion. In United States v. Hoffman (9th Cir. 1979), 607 F.2d 280, firefighters discovered a sawed-off shotgun beneath a smoldering mattress they had removed from a trailer. A police officer arrived at the scene after the fire was extinguished. The police officer entered the trailer with the sole purpose of seizing the shotgun; the officer did not assist the firefighters in their job. <u>Hoffman</u>, 607 F.2d at 282.

¶36. The District Court held that the police officer was justified by exigent circumstances to conduct a search and seizure without obtaining a warrant. On appeal the Ninth Circuit reversed. Hoffman, 607 F.2d at 282. It held, among other things, that a person retains a reasonable expectation of privacy even in areas where the firefighters have entered and discovered contraband. In so doing, it rejected any notion that a person's privacy interest is defined by the extent of the firefighters' previous physical invasion of the premises. Instead, the Ninth Circuit pointed to the Supreme Court's repeated declarations that the Fourth Amendment "protects people not places." Hoffman, 607 F.2d at 284 (citing Katz, 389 U.S. at 351, 88 S.Ct. at 511). The Ninth Circuit stated:

[The police officer's] only purpose in entering appellant's trailer, as he forthrightly admitted, was to seize evidence of an unrelated federal crime. The fact that the police officer's actual physical intrusion was not greater than that of the firemen does not control our examination of appellant's Fourth Amendment claims. The physical invasion of a property interest is not the essence of a Fourth Amendment violation. Rather, "the Fourth Amendment protects people not places." Fire victims do not abandon all reasonable expectations of privacy. One whose home is ablaze certainly should expect that firemen will enter in order to extinguish the fire. Likewise, one should also expect that these same firefighters will be looking for the source or cause of the fire while within the home. But, no citizen should reasonably expect that, because a fire has occurred in his home, and certain few officials may enter, any sort of public officer may thereafter invade his home for purposes unrelated to the initial intrusion.

Hoffman, 607 F.2d at 284-85 (internal citations omitted).

¶37. It is our opinion that the analysis and the reasoning in Hoffman are correct. As we have already pointed out, it is beyond dispute that a person has an expectation of privacy in his or her home--indeed it is in one's home where one has the greatest expectation of privacy. Siegal, 281 Mont. at 274, 934 P.2d at 190. And this expectation continues in homes damaged by fire. Tyler, 436 U.S. at 506, 98 S.Ct. at 1948, 56 L.Ed.2d at 495-96 (citation omitted). Although a firefighter is obviously justified and in fact expected by Montanans to enter a home to extinguish a fire, this does not mean that Montanans reasonably expect that the private sanctity of their home will now be open to other government officers to search for evidence of unrelated criminal activity simply because a firefighter was already legitimately on

the premises.

¶38. The danger of holding, as the Washington Supreme Court did in <u>Bell</u>, that a person has lost the reasonable expectation of privacy in his home after the firefighter has legitimately entered is evident. If there is no reasonable expectation of privacy, then there is no search and seizure. Under such an analysis, any governmental official could lawfully make successive, unrelated searches of any home after a fire, even if no contraband had been discovered by the firefighter; the second official could lawfully enter for any reason or no reason at all. We believe that Montanans would find this to be particularly outrageous and a gross invasion of their privacy.

¶39. Furthermore, the notion that a person abandons his privacy interest and can regain it only by taking affirmative steps, as the State urges and the District Court held, flies in the face of common human experience. A person whose home is burning may leave the scene for many reasons. He may be injured, tired, or even traumatized. This does not mean that the person has abandoned his privacy interest in his home, in his remaining personal effects, or even in the burned remains. Indeed, in some cases, as the Supreme Court pointed out in <u>Tyler</u>, a person may go on living in his home or working in his office after the fire. <u>Tyler</u>, 436 U.S. at 506, 98 S.Ct. at 1948, 56 L.Ed.2d at 495-96. Even if he does not, however, this Court has always held that a home is where a person has the greatest expectation of privacy. <u>See</u>, e.g., <u>Siegal</u>, 281 Mont. at 274, 934 P.2d at 190. A person need not take any affirmative steps to retain that privacy expectation.

¶40. Circumscribing the effect of the <u>Bell</u> court decision as the <u>Mazen</u> court did, by placing spatial and temporal boundaries on the police officer's search may be tempting. As expedient as it may be, however, to hold that the homeowner loses a reasonable expectation to privacy only to those areas of the home where contraband may be seen in plain view or only to those areas of the home where the firefighters are performing their customary work, such an analysis does not pass constitutional muster. As the Ninth Circuit stated in <u>Hoffman</u>, the constitutional protection against unlawful searches and seizures protects people, not places. <u>Hoffman</u>, 607 F.2d at 284-85 (citing <u>Katz</u>, 389 U.S. at 351, 88 S.Ct. at 511). Either a person has a reasonable expectation of privacy or he does not. He does not lose that expectation simply because a firefighter has discovered an object. The police must still have some advanced justification for entering the home, either by a warrant or an exception to the warrant requirement. Moreover, the danger is that police would exceed these

spatial and temporal boundaries, as the police officer did in the case before the Court today. The police officer entered the home even though the firefighters were no longer performing their customary duties at Bassett's home. Once the firefighter led the police officer to Bassett's closet, the officer searched closed drawers for additional criminal evidence that was not in plain view.

¶41. Finally, to argue that the second government agent, in this case a police officer, has "stepped into the shoes" of a firefighter misses the point. First, such an argument is a tacit acknowledgment that the person *does* still enjoy an expectation of privacy in their home. Rather than justifying the police officer's entry by arguing that there was no privacy right and thus no search, the intrusion is justified by transferring the firefighter's legitimate reason for entering the house under an exception to the warrant requirement to the police officer's entry. Second, the argument is a fiction. There in fact, is no nexus between the two entries. In the case before the Court today, the firefighters entered the home to extinguish the fire, to clean up, and to ensure that the fire did not reignite. On the other hand, the police officer entered solely to seize criminal evidence unrelated to the fire. This Court has consistently held that the requirement of advance justification for entry into a home is fundamental. See, e.g., Hubbel, 286 Mont. at 216, 951 P.2d at 980. In this case, there were two separate reasons for entering the house, and there thus must be two entirely separate justifications for each entry.

¶42. Our conclusion that Bassett had a reasonable expectation of privacy is buttressed by the fact that Montanans have heightened expectations of privacy, as evidenced by the specific protection given that right under Article II, Section 10 of Montana's Constitution. We have consistently held that Montana's unique constitutional scheme affords citizens broader protection of their right to privacy than does the Fourth Amendment to the United States Constitution. Hubbel, 286 Mont. at 211, 951 P.2d at 977.

¶43. We have thus frequently extended constitutional protection to areas that the federal constitution does not. In State v. Solis (1984), 214 Mont. 310, 320, 693 P.2d 518, 523, we held that the defendant had a reasonable expectation of privacy in conversations with an undercover officer, and we rejected the holdings of prior federal cases that stated government agents do not need a warrant to record a conversation where one of the conversants consents. In Bullock, based upon our unique privacy provisions, this Court rejected the doctrine that an individual does

not have a legitimate expectation of privacy in an open field. Instead, we held that a person may have a reasonable expectation of privacy in land beyond the curtilage, where that expectation is evidenced by fencing, signs or other indications. State v. Bullock (1995), 272 Mont. 361, 384, 901 P.2d 61, 75-76. Again, in Siegal, this Court held that the use of thermal imaging in a criminal investigation constitutes a search under Montana's unique constitutional scheme. Siegal, 281 Mont. at 275, 934 P.2d at 191. In the absence of a search warrant, the State was required to demonstrate a compelling state interest other than enforcement of the criminal law before using thermal imaging as a criminal investigative tool. Siegal, 281 Mont. at 278, 934 P.2d at 192. In Montana we jealously guard our broad right to privacy. Hubbel, 286 Mont. at 216, 951 P.2d at 980 (citation omitted). We continue to guard it here.

¶44. Based upon all the foregoing, we thus conclude that under Article II, Sections 10 and 11 of the Montana Constitution, a person has an expectation of privacy in his home, even after firefighters have lawfully entered the home and even if the firefighters discover contraband in plain view. We further conclude that a person need not take any affirmative steps to demonstrate that he retains this privacy expectation in his burned home. Finally, we conclude that this privacy expectation is one that society is willing to recognize as objectively reasonable.

¶45. In this case, the police officer invaded Bassett's privacy by searching his home and seizing the contraband. Because the police officer did not obtain a search warrant, the intrusion violated Article II, Sections 10 and 11 of the Montana Constitution, unless the search was justified by an exception to the warrant requirement.

B. Exception to the Warrant Requirement

¶46. We next examine whether the police officer lawfully seized the contraband in Bassett's closet under a carefully carved exception to the requirement that he obtain a warrant prior to entering Bassett's home. We conclude that the search and seizure was not justified by either exigent circumstances or the plain view doctrine.

¶47. Exigent circumstances for conducting a warrantless search exist "where it is not practicable to secure a warrant." State v. McCarthy (1993), 258 Mont. 51, 57, 852 P.2d 111, 114. In determining whether exigent circumstances exist, the court considers factors such as the possible destruction of evidence, the mobility of the

evidence, the safety of police officers, the gravity of the crime, and other emergency situations. <u>McCarthy</u>, 258 Mont. at 57-58, 852 P.2d at 115. In this case, the police officer who searched Bassett's home and seized evidence candidly admitted that there was no emergency situation which demanded that he immediately enter the home without obtaining a search warrant. We agree.

¶48. In this case, the police officer did not enter the home in an attempt to aid the firefighters in saving lives or suppressing the fire. Indeed, when he arrived, the fire trucks and other firefighting equipment were gone, the fire line tape was in place to keep people out of Bassett's home, and only three firefighters remained solely to lead him to the evidence. Because the fire appeared to be extinguished and there was no imminent danger that the evidence would be destroyed, this was not a situation where it was impracticable to obtain a warrant. In this regard, we view the facts in this case to be similar to those in <u>Hoffman</u>.

¶49. In <u>Hoffman</u>, the State argued that the fire had created an exigent circumstance excusing the need to obtain a warrant. However, although the firefighters were still on the scene, entering and exiting the trailer when the police officer arrived, there was no evidence that they were continuing to fight a blaze. Additionally, the police officer himself testified that he did not observe smoke or any other evidence of a fire. <u>Hoffman</u>, 607 F.2d at 282.

¶50. The Ninth Circuit held that no immediate emergency existed to justify the warrantless entry. There was no fire hazard and there was no need to seize the discovered weapon to protect it from destruction. Moreover, the government did not satisfy its heavy burden of justifying a warrantless search by speculating about what "may" or "might" have happened had the police officer not immediately seized the evidence. <u>Hoffman</u>, 607 F.2d at 283-84. In short, "[t]he mere fact that a fire has occurred does not give police officers Carte blanche to enter one's home, even when armed with probable cause to suspect that evidence of a crime may be within the premises." <u>Hoffman</u>, 607 F.2d at 283 (citing <u>Tyler</u>, 436 U.S. at 505-06, 98 S.Ct. at 1948, 56 L.Ed.2d at 495-96). We similarly conclude that the search and seizure in this case was not justified by exigent circumstances.

¶51. We also conclude that the search was not justified by the plain view exception to the warrant requirement. Both the District Court and the State cite this Court's decision in <u>Loh</u>. In <u>Loh</u>, police officers responded to a report of a house fire. When

they arrived on the scene, they were told that there were possibly two people still inside the house. The officers kicked in the doors and crawled through the house in an attempt to rescue people. While in the home, they saw marijuana in plain view, which they seized. Loh, 275 Mont. at 464, 914 P.2d at 594-95. The district court denied the defendant's motion to suppress the evidence, and on appeal after a conviction, this Court affirmed.

¶52. On appeal, this Court traced the development of the plain view doctrine in the federal courts and in Montana. We clarified the standard to be used in this state. We stated that the essential predicate to a warrantless search is that the police officer "must be lawfully at the place from which he could plainly view the evidence." Loh, 275 Mont. at 473, 914 P.2d at 600. In other words, the police officer's initial intrusion must not be in violation of either the federal constitution or Montana's Constitution. Additionally, following the Supreme Court's decision in Horton v. California (1990), 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112, we stated that (1) the item must be in plain view; (2) its incriminating character must be "immediately apparent;" and (3) the officer must have a lawful right of access to the object itself. Loh, 275 Mont. at 473, 914 P.2d at 600.

¶53. We next applied this doctrine to the facts in Loh. We held that the officers were lawfully in the defendant's home, because the exigent circumstances of the apparent fire and the possibility that individuals remained in the home justified the warrantless entry. Loh, 275 Mont. at 474, 914 P.2d at 601. Once in the home, the marijuana was in plain view; the incriminating nature was immediately apparent; and the police had a lawful right to access the contraband. Loh, 275 Mont. at 474, 914 P.2d at 601.

¶54. The case before the Court today is distinguishable. In this case, the police officer testified that from outside of the house, he could not plainly see Bassett's closet and the incriminating evidence contained therein. He could not see the contraband in plain view until he entered Bassett's bedroom. However, the State has not established the essential predicate that the police officer had lawfully entered Bassett's bedroom. As we have already held, unlike the situation in Loh, the police officer's entry was not justified by any exigent circumstances, such as entering to save a person's life, assisting in extinguishing a fire, or preventing the destruction of evidence.

¶55. We conclude that the police officer's entry was not justified by an exception to

the requirement that he obtain a warrant before searching and seizing evidence in Bassett's home. We conclude that the officer's intrusion violated Article II, Sections 10 and 11 of the Montana Constitution. We hold that the District erred when it denied Bassett's motion to suppress the evidence seized by the police officer during the warrantless search of his home.

## ISSUE TWO

¶56. Did the District Court err in denying Bassett's motion to suppress his incriminating statement which was the direct product of the warrantless seizure of evidence?

¶57. The day after the police seized the contraband in Bassett's closet, investigators interviewed Bassett. Bassett admitted that he had been growing marijuana in his home. Bassett now contends that his incriminating statement was obtained as a direct result of the unconstitutional search and thus constitutes "fruits of the poisonous tree" and should be suppressed. See State v. Pearson (1985), 217 Mont. 363, 704 P.2d 1056; Wong Sun v. United States (1963), 371 U.S. 471, 486-88, 83 S.Ct. 407, 417, 9 L. Ed.2d 441, 455. The State concedes that if this Court holds that the search and seizure was unlawful, then Bassett's incriminating statement should also have been suppressed.

¶58. We agree. Bassett's incriminating statement, which was gathered as a result of the unlawful search, is inadmissible by virtue of the exclusionary rule. We hold that the District Court erred when it denied Bassett's motion to suppress that statement.

¶59. Reversed and remanded for further proceedings consistent with this opinion.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART


Chief Justice J. A. Turnage dissenting.

¶60 I respectfully dissent from the majority opinion. In my view, the District Court did not err in its analysis of the suppression issue. Bassett simply did not retain a sufficient privacy interest in the shell of his burnt-out home to prevent the deputy sheriff from seizing the marijuana plants which the firefighters had observed in plain view.

¶61 I agree with the majority that Montana's constitution offers broader protection of the right to privacy than does the federal constitution. However, even in Montana, the right to privacy does not protect from warrantless seizure of that which is in plain view by an officer lawfully on the premises. *See State v. Loh* (1996), 275 Mont. 473, 467, 914 P.2d 592, 60.

¶62 In this case, the District Court sensibly reasoned:

Shortly after the firefighters arrived at his residence, [Bassett] left. He did not return before the deputy arrived, nor did he communicate to the firefighters at any time that he wished to restrict access to his residence. In short, [Bassett] did nothing during the period between [Firefighter] Buller's entry of the residence and the deputy's entry of the residence to evidence a subjective expectation of privacy. Secondly, society at large would not view the deputy's entry into the burned residence as an invasion of privacy, given the circumstances. Firefighters had [] already been through [Bassett's] residence by the time the deputy arrived, and it was largely destroyed and open to the elements. Under the second element of *Loh* the deputy had a lawful right of access to the marijuana plants, because the defendant had no expectation of privacy in the closet at the time the deputy arrived and seized the plants. The seizure, therefore, was lawful.

This was not a case of successive and unrelated entries onto Bassett's property. Fireman Buller and his superiors summoned the deputy sheriff forthwith upon viewing the suspected marijuana and showed the deputy its location.

¶63 I, like the District Court, agree with and would follow the reasoning of the majority of courts which have considered this topic in similar cases. The fact that contraband found in plain view is seized by a state agency separate from the one which initially discovered the contraband in plain view is not significant where the second agency is merely completing what those already on the scene would be justified in doing. *State v. Bell* (Wash. 1987), 737 P.2d 254, 259. *Accord United States v. Brand* (5th Cir. 1977), 556 F.2d 1312; *Sigler v. Anderson* (3rd Cir. 1974), 496 F.2d 793; *United States v. Gargotto* (6th Cir. 1973), 476 F.2d 1009; *United States v. Green* (5th Cir. 1973), 474 F.2d 1385; *Masen v. Seidel* (Ariz. 1997), 940 P.2d 923*; People v. Harper* (Colo. 1995), 902 P.2d 842.

¶64 I would hold that because the marijuana plants were in plain view of officers lawfully on the premises, there was no search, and Bassett's right to privacy under the Montana Constitution did not protect him from warrantless seizure of the plants. I would therefore uphold the District Court's findings of fact and conclusions of law and affirm Bassett's conviction of criminal possession of dangerous drugs.

/S/ J. A. TURNAGE

Justice Karla M. Gray joins in the dissenting opinion of Chief Justice Turnage.

/S/ KARLA M. GRAY