No. 02-305

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 71

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

KALLIE HAMILTON,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin, Cause No. DC 01-223,
The Honorable Mark Guenther, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Brock Albin, Albin Law Office, Bozeman, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; John Paulson,
Assistant Attorney General, Helena, Montana

        Marty Lambert, Gallatin County Attorney;
Ashley Harrington, Deputy County Attorney, Bozeman, Montana

Submitted on Briefs:  October 31, 2002

Decided:  April 4, 2003

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Appellant, Kallie Hamilton, was charged in the District Court for the Eighteenth Judicial District in Gallatin County, with felony Criminal Possession of Dangerous Drugs. Hamilton entered a not guilty plea and filed a motion to suppress both the evidence discovered by the Bozeman Police Department during two warrantless searches of her lost wallet and the incriminating statements made subsequent to the searches. Following a hearing, the District Court concluded that an individual's subjective expectation of privacy in lost or abandoned property is not objectively reasonable. Hamilton's motion to suppress evidence was denied; she entered a guilty plea; and, she reserved the right to appeal the denial of her motion to suppress. Based on that appeal, we reverse the order of the District Court.

¶2 We restate the issues on appeal as follows:

¶3 1. Is there an objectively reasonable expectation of privacy in a lost wallet?

¶4 2. Did the District Court err when it denied Hamilton's motion to suppress evidence obtained during the initial warrantless search of Hamilton's wallet?

¶5 3. Did the District Court err when it denied Hamilton's motion to suppress evidence obtained and statements made as the result of the second warrantless search of Hamilton's wallet?

FACTUAL AND PROCEDURAL BACKGROUND

¶6 On March 11, 2001, a woman's wallet was turned over to the Bozeman Police Department. The officer entrusted with the wallet completed the requisite paperwork and

2

gave it to Dennis Thompson, a public relations employee. Thompson was directed to find the owner of the wallet and return it.

¶7 The wallet consisted of two opposing compartments and a zippered coin purse in the center. The right compartment featured a clear plastic window which revealed a driver's license. The left compartment held a checkbook, which included the owner's phone number and address. The contents of the zippered coin purse could not be viewed unless the coin purse was unzipped. When folded the wallet was secured by a flap which concealed its contents.

¶8 Thompson opened the wallet to determine the identity of the owner and conducted an "inventory search" without a warrant. He testified an "inventory search" of lost property is routinely conducted to determine if the property contains valuables. If a wallet contains valuables, it is stored in the evidence room for safekeeping.

¶9 During the search, Thompson opened the zipper of the coin purse and an amount white powder escaped. Further investigation revealed that the coin purse contained a substantial amount of the white powder. Thompson turned the wallet over to the Drug Task Force and informed Detective Greg Megargel that the wallet was "suspicious." No inventory was recorded by Thompson and he could not recall if he had determined the identity of the wallet's owner before he searched the coin purse and discovered the powder.

¶10 Detective Megargel conducted a second search of the wallet without a warrant and found a small bag containing crushed red and white capsules with a white powder residue. Detective Megargel determined that the white powder was Roxilox, a Schedule II controlled

3

narcotic. The owner of the wallet, Kallie Hamilton, was finally contacted using the identification information found in the wallet. Hamilton was informed that her wallet had been turned over to the police and that a controlled substance had been found in the coin purse. Initially, Hamilton claimed she had a prescription for the Roxilox. Later, she admitted that the drug was not prescribed for her and that she did not acquire it from a pharmacist.

¶11 Hamilton was charged by information in the Eighteenth Judicial District Court with Criminal Possession of Dangerous Drugs, a felony, in violation of § 45-9-102, MCA (1999). She entered a plea of not guilty and filed a motion to suppress evidence. Hamilton argued that the drugs discovered in her wallet, and the admissions she made subsequent to that discovery, were attained in violation of the United States Constitution and the Montana Constitution because the searches were conducted without a warrant.

¶12 A hearing was held on January 31, 2002. On February 4, 2002, the District Court concluded that Hamilton had a subjective expectation of privacy in her lost wallet, but that her expectation of privacy was not objectively reasonable. The court held that no search had occurred within the contemplation of the Fourth Amendment of the United States Constitution or Article II, Section 11 of the Montana Constitution. Hamilton's motion to suppress was denied. Consequently, she entered a plea of guilty on February 5, 2002, and reserved the right to appeal the District Court's Order.

STANDARD OF REVIEW

¶13    Our standard of review of a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous and whether those facts were correctly applied as a matter of law. *State v. Williams* (1995), 273 Mont. 459, 462, 904 P.2d 1019, 1021.

DISCUSSION

¶14    Whether law enforcement is required to obtain a warrant before searching a lost wallet is an issue of first impression in Montana. The Fourth Amendment to the United States Constitution provides the traditional protections against unwarranted searches. However, Montanans have a heightened expectation of privacy pursuant to the protections found at Article II, Sections 10 and 11, of the Montana Constitution. *State v. Scheetz* (1997), 286 Mont. 41, 45, 950 P.2d 722, 724.

¶15    Article II, Section 10, states: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

¶16    Article II, Section 11, states:

> The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

¶17    Whether an individual's right to privacy guaranteed by the Montana Constitution has been infringed by an unlawful search depends on whether there has been a government

5

intrusion into an area subject to a reasonable expectation of privacy. *Scheetz*, 286 Mont. at 46, 950 P.2d at 724. A search occurs when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable. *Scheetz,* 286 Mont. at 46, 950 P.2d at 724 (citing *United States v. Jacobsen* (1984), 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94). If there is no reasonable expectation of privacy, "'there is neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment of the United States Constitution or Article II, Section 11 of the Montana Constitution.'" *Scheetz*, 286 Mont. at 46, 950 P.2d at 725 (quoting *State v. Bennett* (1983), 205 Mont. 117, 121, 666 P.2d 747, 749).

¶18 The inquiry into whether there has been an unlawful search in violation of the Montana Constitution is two-fold: (1) we look at whether the person has an actual expectation of privacy that society is willing to recognize as objectively reasonable; and (2) we look at the nature of the state's intrusion. *Scheetz*, 286 Mont. at 48, 950 P.2d at 726.

ISSUE 1

¶19 Is there an objectively reasonable expectation of privacy in a lost wallet?

¶20 Hamilton asserts that the District Court was incorrect when it concluded that she did not have an objectively reasonable expectation of privacy in her lost wallet. She contends that she retained a diminished expectation of privacy in her lost wallet.

¶21 The State contends that once an individual abandons her property, either intentionally or accidently, the expectation of privacy recognized by society is nearly non-existent; and that, consequently, there was no search of her wallet for constitutional purposes.

6

¶22　There is no question that Hamilton had an actual expectation of privacy with respect to the contents of her lost wallet. She expected that the person who found her wallet would look inside for identification, see her driver's license or checkbook, and return the wallet to her without further intrusion.

¶23　Moreover, there is no question that society views a person's expectation of privacy in a wallet or purse as objectively reasonable. Few things are more inherently private than the contents of a wallet or purse. *See State v. Johnson* (1982 Wash.), 645 P.2d 63, 64 ("It would be difficult to define an object more inherently private than the contents of a woman's purse"); *State v. May* (1992 Me.), 608 A.2d 772, 774-75 (Defendant's wallet was held to be a repository for personal effects inevitably associated with an expectation of privacy). We see no meaningful distinction between the expectation of privacy a person has in the contents of a purse and the contents of a wallet. Social security cards, credit cards, cash, food stamps, phone numbers, pictures of loved ones, and other personal effects are often stowed in a wallet to make them readily available to the owner, yet hidden from the uninvited eyes of strangers.

¶24　The question we must answer is whether society continues to view a person's actual expectation of privacy as objectively reasonable when she loses her wallet.

¶25　Our analysis begins with the District Court's erroneous characterization of Hamilton's motion to suppress. The District Court stated that: "The motion to suppress challenges law enforcement's warrantless search of an item of lost or abandoned property." It appears that the District Court did not distinguish an individual's expectation of privacy with regard to

7

abandoned property from an individual's expectation of privacy with regard to lost property. However, the distinction between abandoned and lost property is critical to any consideration of whether there is a reasonable expectation of privacy in the subject wallet.

¶26     This Court has held that when a person intentionally abandons her property, that person's expectation of privacy with regard to that property is abandoned as well. *See State v. Amaya* (1987), 227 Mont. 390, 392, 739 P.2d 955, 957. In the case of a lost item, however, the owner has not intentionally or voluntarily abandoned his or her property. It follows that the expectation of privacy one has in his or her wallet was not voluntarily surrendered and remains substantially intact. Courts have recognized that the owner of lost or mislaid property retains a reasonable expectation of privacy in that item, diminished to the extent that the finder may examine the contents of that item as necessary to determine the rightful owner.

¶27     In *State v. Ching* (1984 Haw.), 678 P.2d 1088, the Hawaii Supreme Court considered whether Ching had an objectively reasonable expectation of privacy in a small brass cylinder contained in a pouch that also held his driver's license, which was found by police prior to searching the cylinder. The prosecution argued that Ching had no reasonable expectation of privacy in the lost items and, therefore, the search of the brass cylinder was not constitutionally prohibited. The court held, however:

> Moreover, Ching's expectation of privacy in the cylinder was socially reasonable even though he had misplaced it. . . . Property is lost through inadvertence, not intent. Although owners of lost property may expect some intrusion by finders common sense dictates that they do not forfeit all expectations of privacy in their property as though they had abandoned it.

8

*Ching*, 678 P.2d at 1092.

¶28 In *State v. Kealey* (1995 Wash.), 907 P.2d 319, the Washington Supreme Court considered whether Kealey had a reasonably objective expectation of privacy in a lost purse that was searched by police without a warrant. The court held:

> [T]he owner of lost or mislaid property, who is in the eyes of the common law an inadvertent bailor, retains a reasonable expectation of privacy in the property . . . This expectation of privacy is diminished, however, by the fact that the finder/bailee has an obligation to seek out the owner of the goods and try to return them. In other words, the owner's expectation of privacy is diminished to the extent that the finder may examine and search the lost property to determine its owner.

*Kealey*, 907 P.2d at 325-26 (citations omitted).

¶29 The above cases stand for the common sense proposition that the law and society recognize a difference between a person who abandons property and a person who loses property but retains the right and desire to regain possession of that property. The integral relationship of one's intent to the expectation of privacy, is not new to this Court: "'What a person knowingly exposes to the public is not protected . . .' 'the reasonableness of [the defendant's] expectation of privacy turned on the defendant's right to exclude others from the premises.'" *Scheetz*, 286 Mont. at 49, 950 P.2d at 726-27 (citations omitted).

¶30 In this case, Hamilton did not intentionally or knowingly expose her wallet to the public and her right to exclude others from the contents of her wallet remained intact. The reality that certain people lack respect for the property of another is no reason to diminish the expectation of privacy we protect so jealously in Montana. Pursuant to the Montana Constitution, every person who has a reasonable expectation of privacy in property maintains

that expectation even though the property has been misplaced. That privacy interest may not be violated by the state unless the intrusion is closely tailored to further a compelling state interest.

¶31    Consequently, we conclude that Hamilton had an objectively reasonable expectation of privacy in her lost wallet.  Her expectation of privacy was diminished only to the extent necessary for the police to determine ownership.  We conclude that the District Court erred when it held that Hamilton did not have an objectively reasonable expectation of privacy in her lost wallet.

## ISSUE 2

¶32    Did the District Court err when it denied Hamilton's motion to suppress evidence obtained during the initial warrantless search of Hamilton's wallet?

¶33    Hamilton asserts that the search of her coin purse cannot be justified as an inventory search because it did not incorporate the least intrusive means.  She contends that the only justification Thompson had for searching her wallet without a warrant was to determine ownership.  Hamilton argues that identification information was readily apparent in the right and left compartments of her wallet and that, therefore, Thompson was not permitted to search the coin purse without a warrant.  The State responds that the search was an administrative inventory search similar to the search permitted by this Court in *State v. Pastos*.

¶34    A warrantless search is *per se* unreasonable unless it falls within one of the narrow exceptions to the warrant requirement.  *Reeves v. State* (1973 Alaska), 599 P.2d 727, 735;

*see Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. We have considered the extent to which the State is permitted to conduct a warrantless inventory search of an arrestee's personal property at the station house and searches incident to arrest on numerous occasions. The seemingly inconsistent results reached by this Court in those decisions reflect the slight factual variations in each case. Consequently, while those cases provide guidance, their precedential value is limited by the factual and circumstantial differences.

¶35 This Court, however, has established some fundamental principles of law applicable to searches and seizures of property for inventory purposes. In *State v. Sawyer* (1977), 174 Mont. 512, 571 P.2d 1131 (overruled on other grounds by *State v. Long* (1985), 216 Mont. 65, 67, 700 P.2d 153, 155), we recognized two justifications for an inventory search of an impounded vehicle: (1) protection of the contents of the vehicle for the owner's benefit; and (2) protection of the police from claims for lost property in their custody. *Sawyer*, 174 Mont. at 517, 571 P.2d at 1134.[1] Although we recognized those concerns as legitimate, we held that a general search of the defendant's property was neither justified nor necessary "under the countervailing force of the right of the individual to privacy and freedom from unreasonable searches in Montana." *Sawyer*, 174 Mont. at 518, 571 P.2d at 1134. We concluded that the police could protect themselves from liability for lost or stolen property by taking an inventory of the items in plain view, locking the vehicle, and returning the keys

---

[1] Protection of the arrestee's property was discounted as a justification in that case because the arrestee was available for consultation.

to the owner. *Sawyer*, 174 Mont. at 518, 571 P.2d at 1134. Importantly, *Sawyer* required the State to use the least intrusive means to protect itself from a claim for lost or stolen contents found in an impounded automobile.

¶36 Eight years later, in *State v. Sierra* (1985), 214 Mont. 472, 478, 692 P.2d 1273, 1277 (overruled on other grounds by *State v. Pastos* (1994), 269 Mont. 43, 57, 887 P.2d 199, 208), we concluded that the broader privacy protections of the Montana Constitution required that the State incorporate the least intrusive means possible when it conducted an inventory search of a briefcase that belonged to a person in police custody. This Court rejected *Illinois v. Lafayette* (1983), 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65, a case in which the United States Supreme Court held that the State's interest in an inventory search conducted to preserve property, protect the police from claims for lost property, identify the owner, and protect the police from hazards presented by uninventoried packages outweighed the defendant's privacy interest. *Sierra*, 214 Mont. at 475-76, 692 P.2d at 1275-276.

¶37 In *State v. Pastos* (1994), 269 Mont. 43, 47, 887 P.2d 199, 202, this Court confirmed that the right to privacy may only be infringed by a compelling state interest and a procedure closely tailored to effectuate that interest. We held that:

> [T]he State has a legitimate and compelling interest in protecting, to the extent possible, the safety of the arrestee and other persons in and about the station house from weapons, dangerous instrumentalities, and hazardous substances which might be concealed on or in the personal property and possessions of the arrestee.

*Pastos*, 269 Mont. at 51, 887 P.2d at 204. *Pastos* stands for the proposition that the State has a compelling interest in safety that justifies an inventory search of personal property on, or

12

in the possession of, an arrestee at the police station. The arrestee's immediate possession of the property was a determinative factor in that case. *Pastos*, 269 Mont. at 57, 887 P.2d at 208. We overruled our holding in *Sierra* to the extent that it required the State to use the least restrictive means possible when an inventory search is conducted for safety reasons. *Pastos*, 269 Mont. at 57, 887 P.2d at 208. Inventory searches conducted to protect valuables of the arrestee and to protect the police from lost or stolen property claims were only discussed in dicta.

¶38    The compelling interest asserted in *Pastos* was the need for police to ensure that the property an arrestee possessed when he was arrested did not pose a threat to those he would come into contact with at the station. Nothing in *Pastos* permits the police to conduct a general search of property held in police custody when the asserted justification relates only to protecting the property for the owner and protecting the police from a claim for lost or stolen property.

¶39    We conclude that the danger posed by property possessed by an arrestee, as was the case in *Pastos,* is not present here–there was no risk that Hamilton would pull a weapon out of her lost wallet. The Constitution does not allow a general search of a benign object based on such a remote possibility of harm as is suggested by the State in this case. Absent an objectively reasonable belief that the wallet posed some real threat to safety, the State's claim that there was a compelling safety interest which justified a general search of the wallet for weapons, explosives or hazardous materials is implausible. *See Ching*, 678 P.2d at 1093.

13

¶40    Three additional interests have been asserted by the State: (1) the need to determine the owner's identity; (2) the need to protect any valuables; and (3) the need to protect the police from a claim that the contents of the wallet were lost or stolen while in police custody. In both *Sawyer* and *Sierra,* the inventory search was conducted while the owner of the property was in police custody. Consequently, we concluded the need to identify the owner and the need to protect the property for the owner did not justify an inventory search in either case. However, the fundamental requirement that the State use the least intrusive method to protect itself from a claim for lost or stolen property as discussed in those cases is applicable to the current case.

¶41    In *Reeves v. State*, the Alaska Supreme Court considered the extent to which the state was permitted to conduct an inventory search for the dual purpose of protecting property for an arrestee and protecting itself from claims for lost or stolen property. The court reviewed the search pursuant to the heightened expectation of privacy provided for by the Alaska Constitution. The Alaska court stated:

> An arrestee's property can be sufficiently protected simply by placing it in a 'property bag' . . . However benevolent the state's intentions in this regard, [the protection of valuables] cannot serve as a justification for a general search of the arrestee's possessions.
>
> . . . .
>
> [T]he state, as an involuntary bailee, has 'only a 'slight' duty of care' with respect to property in its possession . . . and this 'duty could easily be met without extensive inventory.' The state can effectively insulate itself against fraudulent claims by simply listing by description any items of property taken from an arrestee; securing those items in a property bag or other secure storage container used in the facility, preferably in the arrestee's presence . . .

14

. . . .

> FN 28. The government's interest in protecting itself against fraudulent post-incarceration claims of loss or damage to property is at best a tenuous reason for infringing the privacy of an individual's belongings. Consequently, an inventory search should be rigidly circumscribed in scope, perhaps more so than any other type of justified warrantless search.

*Reeves*, 599 P.2d at 736-37 (citations omitted).

¶42 A post-arrest inventory and the inventory search of a lost wallet occur under different circumstances. The search of a lost item should be by the least intrusive means necessary to identify its owner and secure the property. The method of securing property in *Reeves* is consistent with the least intrusive means discussed by this Court in *Sawyer* and *Sierra*.

¶43 As a gratuitous bailee, the police are charged with a slight duty of care which is violated only by gross negligence. *Sawyer*, 174 Mont. at 517, 571 P.2d at 1134. Common sense suggests the risk that valuables would be misplaced or stolen increase with the frequency and intensity with which the valuables are handled and examined. The cited cases provide a convincing argument that no search is required to secure the contents of a lost wallet and protect the police from a claim for lost or stolen valuables. The least intrusive manner to secure the contents of a lost wallet, which is also the most effective manner, is to place the wallet in an evidence bag and store it in a secure place until it is claimed by its rightful owner.

¶44 Next, we must determine to what extent the police are permitted to conduct a search to identify the owner. Identification of the owner is the State's paramount objective as the

15

bailee of a lost wallet. *See Ching*, 678 P.2d at 1092-93. This task requires that the State conduct the minimum search necessary to determine ownership.

¶45 The courts in *Ching* and *Kealey* held that the government was permitted to conduct a warrantless search of lost property to the extent necessary to determine ownership. Hamilton agrees that the police were permitted to look inside her wallet for identification so it could be returned. However, she contends that when Thompson opened her coin purse, he went beyond the scope of what was necessary to determine ownership.

¶46 We conclude that the least intrusive means possible must be used to identify the owner of lost property, protect the contents of personal property for the owner, and to protect the police from claims for missing valuables. The contents of a lost wallet can be secured by placing the wallet in an evidence bag and storing it in a secure place. This method is also sufficient to protect the police from a claim for lost or stolen valuables. Consequently, the State may only conduct a warrantless search of a lost wallet to determine ownership. Furthermore, an identification search must be conducted pursuant to standardized police procedure and must reach no further than necessary to confirm ownership.

¶47 We conclude that Thompson's search exceeded what was necessary to identify the wallet's owner. Hamilton testified that a driver's license was displayed in the right compartment and a checkbook was displayed in the left compartment of her wallet–both of which would have been apparent upon releasing the flap and opening the wallet. While Thompson could not recall if he saw the checkbook or driver's license before he conducted his search, he admitted it was possible that the identification information was readily

16

apparent. Finally, when Detective Megargel took custody of the wallet, he found a driver's license, a social security card, and a checkbook that all indicated Kallie Hamilton owned the lost wallet. It is clear that there was no need to search the coin purse to determine that Hamilton owned the lost wallet in light of the above facts.

¶48 Therefore, we conclude that the evidence discovered as the result of the search conducted by Thompson must be suppressed.

ISSUE 3

¶49 Did the District Court err when it denied Hamilton's motion to suppress evidence obtained and statements made as the result of the second warrantless search of Hamilton's wallet?

¶50 The subsequent search, which was conducted by Detective Megargel of the Drug Task Force, was performed after Thompson discovered the powder in the coin purse and informed Detective Megargel that the wallet was "suspicious." This search was neither an identification search, nor was it an inventory search. It was an investigative search conducted to determine whether or not the suspicious nature of the wallet was evidence of criminal activity. Therefore, Detective Megargel was required to obtain a search warrant absent an exception to the warrant requirement.

¶51 The State does not argue that the search was conducted pursuant to an exception to the warrant requirement. Instead the State cites *State v. Copridge* (1996 Kan.), 918 P.2d 1247, 1251, and contends that Detective Megargel was permitted to take a "second look" at the wallet. The court in *Copridge* held that no warrant was required to conduct a post-arrest

17

search of clothing lawfully seized by police because the arrestee had no expectation of privacy. *Copridge* interprets Kansas and Federal law on an entirely different issue than the one raised by the warrantless search of Hamilton's wallet and is irrelevant.

¶52 Our review of the record indicates that the search was not justified by any other exception to the warrant requirement. Therefore, the warrantless search conducted by Detective Megargel was illegal and violated Hamilton's expectation of privacy. Consequently, Detective Megargel's discovery of the powder and determination that it was a controlled substance must be suppressed. We conclude that the District Court erred when it denied Hamilton's motion to suppress the evidence discovered during Detective Megargel's warrantless search.

¶53 The white powder discovered by Thompson, and the illegal nature of the white powder confirmed by Detective Megargel, were both the results of unconstitutional searches. Hamilton contends that the incriminating statements she made subsequent to the illegal searches are "fruits of the poisonous tree" that should be suppressed as well. It is well established that an incriminating statement made as the direct result of an illegal search is inadmissible by virtue of the exclusionary rule. *State v. Bassett*, 1999 MT 109, ¶ 57, 294 Mont. 327, ¶ 57, 982 P.2d 410, ¶ 57. We conclude that the statements made by Hamilton following the illegal search conducted by Detective Megargel must be suppressed.

¶54 Based on the foregoing conclusions, the Order of the District Court is reversed, and we remand this case to the District Court for further proceedings consistent with this Opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER

Justice James C. Nelson concurs.

¶55    I concur in our Opinion and have, accordingly, signed the same.

¶56    It is also worth noting that even Montana's statutory law does not justify the sort of intrusive search that was conducted in this case.  This State's law on bailments provides that an "involuntary deposit" or bailment occurs when, among other things, a person accidentally leaves or places personal property in the possession of any person, without negligence on the part of the owner.  Sections 70-6-101(1), MCA and 70-6-103(1), MCA.  The person with whom a thing is involuntarily deposited is then bound to take charge of it if able to do so.  Section 70-6-104, MCA.  Certainly, when one accidentally loses his or her wallet or purse and it comes into the possession of the police or some other third party, an involuntary bailment occurs and the police or third party become depositaries.

¶57    Section 70-6-201, MCA, provides that:

> A depositary may not use the thing deposited or permit it to be used for any purpose without the consent of the depositor.  *He may not, if it is purposely fastened by the depositor, open it without the consent of the latter, except in case of necessity.*  [Emphasis added.]

Again, while necessity may dictate that the depositary open a fastened wallet or purse to the extent required to conduct a minimally intrusive search for the owner's identity, once that purpose is fulfilled, the depositary is prohibited under this statute from opening other fastened compartments and containers in the wallet or purse absent the consent of the owner.

¶58    In the case at bar, the police, as involuntary depositaries, were within their authority to unfasten Hamilton's wallet to learn her identity.  However, once that was determined--and

20

in this case it was as soon the wallet was unfastened--they could go no further.

¶59    I concur.

/S/ JAMES C. NELSON