JUSTICE COTTER
delivered the Opinion of the Court.
¶1 Nina Demontiney (Demontiney) appeals from an order of the Twelfth Judicial District Court, Hill County, denying her motion to suppress and dismiss. We affirm.
ISSUE
¶2 A restatement of the dispositive issue on appeal is:
¶3 Did the District Court err in denying Demontiney’s motion to suppress and dismiss?
FACTUAL AND PROCEDURAL BACKGROUND
¶4 On January 5,2010, Hill County SherifFDeputies Stephen Martin and Pete Seymour responded to a report that two women, one of whom was Demontiney, were being detained at Wal-Mart after exiting the store with stolen purses. After conducting a warrant check, the deputies learned that Demontiney had an outstanding city warrant for $310. The deputies handcuffed both women, searched their persons for weapons, and escorted them to a patrol vehicle to transport them to the Hill County Detention Center. Demontiney asked to return to her vehicle in the Wal-Mart parking lot to drop offher purse; the deputies denied this request. Demontiney’s purse was transported to the Detention Center in another patrol car.
¶5 At the Detention Center, Officer Eckhardt conducted an inventory search of Demontiney’s purse and found a plastic Wonder Bread sandwich container containing 39 bags of a white rock-like substance, weighing approximately 21.5 grams in total. He also found $1,845.00 in cash, two razor blades, a straw, a pill grinder containing a *213 Hydrocodone pill, and a piece of paper with the following notation: “1 $1,500.00; bundle 2 $2,400.00; coke $2,200.00; and weed $425.00.” The white rock-like substance tested positively for cocaine.
¶6 The State subsequently charged Demontiney with criminal possession of dangerous drugs with intent to distribute, a felony, in violation of § 45-9-103, MCA (Count I), and criminal possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA (Count II). Demontiney filed a motion to suppress or dismiss, and the District Court held a hearing on the motion on February 6, 2012. Deputy Seymour and Officer Eckhardt testified, and Demontiney and the State presented arguments about the lawfulness of the search. On February 22, 2012, the District Court denied Demontiney’s motion. During a change of plea hearing on March 27, 2012, Demontiney pleaded guilty to both counts and expressly reserved the right to appeal the denial of her motion to suppress and dismiss. The District Comí; accepted Demontiney’s admission and change of plea. On May 14, 2012, the District Court sentenced Demontiney to three years, deferred, for Count I and six months with all but three days suspended for Count II.
¶7 Demontiney timely appealed the denial of her motion. She argues that under these facts, the State did not have a compelling interest outweighing her right of privacy in her purse and the closed containers within it. Demontiney further argues that the search was unreasonable and violated her rights under Article D, Sections 10 and 11 of the Montana Constitution because the officers conducted the search for an investigatoiy purpose. Demontiney requests that we overturn State v. Pastos, 269 Mont. 43, 887 P.2d 199 (1994), and adopt the standard set forth in State v. Sierra, 214 Mont. 472, 692 P.2d 1273 (1985), overruled in part, Pastos, 269 Mont. at 57, 887 P.2d at 208, and Reeves v. State, 599 P.2d 727 (Alaska 1979).
¶8 The State counters that the search was permissible under Pastos because inventory searches are an established exception to the warrant requirement, safety is a compelling state interest, and the search satisfied the requirements for an inventory search. The State urges us to reaffirm Pastos.
STANDARD OF REVIEW
¶9 When reviewing a district court’s ruling on a motion to suppress evidence, we determine whether the court’s underlying factual findings are clearly erroneous and whether the court’s interpretation and application of the law are correct. State v. Morrisey, 2009 MT 201, ¶ 14, *214 351 Mont. 144, 214 P.3d 708 (citation omitted). A court’s findings are clearly erroneous if they are not supported by substantial evidence or if this Court’s review of the record leaves us with a definite or firm conviction that a mistake has been made. Morrisey, ¶ 14 (citation omitted).
DISCUSSION
¶10 Did the District Court err in denying Demontiney’s motion to suppress and dismiss?
¶11 The Fourth Amendment of the United States Constitution provides the traditional protections against unwarranted searches; however, Montanans have a heightened expectation of privacy pursuant to Article II, Sections 10 and 11 of the Montana Constitution. State v. Hamilton, 2003 MT 71, ¶ 14, 314 Mont. 507, 67 P.3d 871. Article II, Section 10 states: “The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.” Section 11 provides:
The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.
¶12 “In discussing Montana’s constitutional right of privacy, we have heretofore recognized at one and the same time the fundamental nature of that right, and that the right is not absolute under all circumstances.” Pastos, 269 Mont. at 47, 887 P.2d at 202. We have recognized that “an arrestee has an expectation of and constitutional right of privacy in the personal property on his or her person or in his or her possessions while at the police station.” Pastos, 269 Mont. at 52, 887 P.2d at 204. However, “[t]he expectations of privacy of an individual taken into police custody necessarily are of a diminished scope,” a significant factor which the Dissent wholly fails to acknowledge in its analysis of Demontiney’s privacy interests. Maryland v. King,_U.S._, 133 S. Ct. 1958, 1978, 1980 (2013) (citation omitted; internal quotation marks omitted) (holding that the processing of an arrestee’s DNA sample did not intrude on the arrestee’s privacy in a way that would make his DNA identification unconstitutional when he was already in valid police custody for a serious offense supported by probable cause and the DNA sample was *215 taken as a routine booking procedure for serious offenders).
¶13 When the State intrudes upon a fundamental right, it must demonstrate a compelling state interest for doing so that is closely tailored to effectuate only that compelling interest. Pastos, 269 Mont. at 47, 887 P.2d at 202 (citation omitted). In Pastos, this Court concluded that there is a compelling state interest justifying a routine, administrative inventory search of the personal property on or in the possession of the arrestee at the station house following a lawful arrest. “[T]he compelling state interest is the protection of the arrestee, the police, other inmates, and persons and property in and about the station house from the harm and potential for harm posed by weapons, dangerous instrumentalities and hazardous substances that might be concealed on or in the possessions of the arrestee.” Pastos, 269 Mont. at 47-48, 887 P.2d at 202.
¶14 Demontiney requests that we overrule our decision in Pastos. Demontiney argues that the Pastos Court should have analyzed inventory searches under Article II, Section 11 because “[t]he heightened protections provided in Article II, Sections 10 and 11 require the State to use less intrusive means of inventory searches for any property hi closed containers that will be stored while an arrestee is in jail and will be returned upon release.” The State maintains that this argument is unfounded as “it is the operation of [Slection 10 upon [Slection 11 that distinguishes Montana’s jurisprudence from federal Fourth Amendment rights.”
¶15 In Pastos, this Court set forth Sections 10 and 11, noted that Section 11 was “obviously” pertinent, and focused its analysis on Section 10 “in view of the posture in which the question of law to be decided is presented to us.” Pastos, 269 Mont. at 47, 887 P.2d at 202. The fact that the Court focused on Section 10 does not constitute grounds for overruling the decision. While Article II, Section 11 mirrors the federal Fourth Amendment, Section 10 has no federal constitutional counterpart and grants Montana citizens a specific right to privacy. It is the language in Section 10 that is the “unique constitutional language assuring] citizens a greater right to privacy and broader protections.” State v. Hardaway, 2001 MT 252, ¶ 34, 307 Mont. 139, 36 P.3d 900; see e.g. State v. Bassett, 1999 MT 109, ¶ 42, 294 Mont. 327, 982 P.2d 410 (“Our conclusion that Bassett had a reasonable expectation of privacy is buttressed by the fact that Montanans have heightened expectations of privacy, as evidenced by the specific protection given that right under Article II, Section 10 of Montana’s Constitution.”).
*216 ¶16 As we observed in Pastos, there are three problems inherent in the “less intrusive means” approach that Demontiney urges us to adopt: (1) if a closed container contains a weapon, an arrestee can retrieve the weapon and use it in a matter of seconds; (2) if an arrestee is cariying a concealed bomb, explosive or incendiary device, there is little that the police can do against the potential harm inherent in such a situation short of a physical search of the arrestee’s possessions; and (3) it is impractical and unreasonable to expect the police to make decisions on a daily basis about which containers to search and what the least intrusive means would be in each situation. Pastos, 269 Mont. at 50-51, 887 P.2d at 204. Though we listed these problems, we did not expressly reject the ‘less intrusive means” approach but instead concluded that it would be difficult to fashion a ‘less intrusive means” of conducting the search of a closed container than opening it. See Pastos, 269 Mont. at 51, 887 P.2d at 204 (“[I]t does not follow that the less intrusive means rule mandates that the police use some method short of physically searching the arrestee’s possessions.”).
¶17 “Although stare decisis is not a rigid doctrine that forecloses the reexamination of cases when necessary, weighty considerations underlie the principle that courts should not lightly overrule past decisions.” Certain v. Tonn, 2009 MT 330, ¶ 19, 353 Mont. 21, 220 P.3d 384 (quotation marks omitted; internal citation omitted). “Faced with viable alternatives, stare decisis provides the ‘preferred course.’ ” Certain, ¶ 19 (citation omitted). We decline to overrule a decision that has been in eifect for over twenty years and has provided a bright line rule for law enforcement. Because we still find the reasoning in Pastos persuasive, perhaps even more so today given the “reality of the times in which we live,” we reaffirm our conclusion in Pastos that “[t]he routine, administrative inventory search of the personal property on or in the possessions of the arrestee[, including closed containers,] at the police station following arrest is closely tailored to effectuate the compelling interest of safeguarding persons and property in the station house from weapons, dangerous instrumentalities and hazardous substances which might be concealed in the arrestee’s possessions.” Pastos, 269 Mont. at 48, 51-52, 887 P.2d at 202, 204.
¶18 We must now decide whether this search was valid as an inventory search under Pastos. Demontiney argues that her case is factually distinguishable from Pastos because: (1) her purse was not in her immediate possession; (2) the purse was transported to the police station separately from her and over her objection; and (3) there was evidence that the search was conducted for investigatory purposes *217 instead of as part of routine booking procedure.
¶19 We held in Pastos that property in the “immediate possession” of the arrestee at the time of arrest may be subject to a valid inventory search. Pastos, 269 Mont. at 57, 887 P.2d at 208. Demontiney’s purse was on the floor next to her at the store when the deputies arrived. Because Demontiney was taken into custody at Wal-Mart, the record indicates that the purse was in her “immediate possession” at the time of arrest. Thus, it is immaterial that she objected to the deputies transporting the purse, that the purse was transported in a separate vehicle, and that the purse was not in her possession at the station. See State v. Boswell, 804 P.2d 1059, 1062 (N.M. 1991) (“The wallet, although on defendant’s person at the time of arrest, was not in his possession immediately prior to his incarceration. However, the concerns underlying the reasonableness of an in-station inventory search justify the officer’s return to the store to retrieve the wallet and its subsequent inventoiy.”).
¶20 Law enforcement officers are not required to individually assess the risk posed by each arrestee before conducting an inventory search, Pastos, 269 Mont. at 49, 887 P.2d at 203, and an inventory search is valid even if there may be an investigative motive. See U.S. v. Bowhay, 992 F.2d 229, 231 (9th Cir. 1993) (“[T]he department’s policy was to search everything; the officer had no discretion. Because of this, the presence of an investigative motive does not invalidate the inventory search.”). In Illinois v. Lafayette, 462 U.S. 640, 103 S. Ct. 2605 (1983), a unanimous United States Supreme Court agreed that:
At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the station house. A standardized procedure for making a list or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person.
Lafayette, 462 U.S. at 646, 103 S. Ct. at 2609.
¶21 The Court went on to observe that dangerous instrumentalities, such as razor blades, bombs, or weapons, can be concealed in articles taken from the possession of the arrestee. Lafayette, 462 U.S. at 646, *218 103 S. Ct. at 2609. For these reasons, the Court deemed the inventory search “an entirely reasonable administrative procedure.” Lafayette, 462 U.S. at 646, 103 S. Ct. at 2610.
¶22 The Dissent argues that Demontiney’s property posed no actual danger. Dissent, ¶ 39. Of course, it is easy to make this determination in hindsight. As we noted in Pastos, however, citing Lafayette, “[i]t is immaterial whether the police actually fear any particular package or container; the need to protect against [the above-referenced risks] arises independently of a particular officer’s subjective concerns.” Pastos, 269 Mont. at 49, 887 P.2d at 203 (citing Lafayette, 462 U.S. at 646, 103 S. Ct. at 2610 (citation omitted». Though a review of the record suggests there may have been an investigatory purpose for the search,[1] there was clearly a standardized procedure in place providing for the search of the possessions of all arrestees at the station, and the evidence indicates the search occurred pursuant to this routine procedure during Demontiney’s booking for the shoplifting crime. At the jail, Demontiney asked the detention officer if he “was going to search her purse,” and he “said yes, it was standard procedure.” We therefore conclude that the search of Demontiney’s purse and the enclosed containers was a valid inventory search.
¶23 Having concluded that this was a valid inventory search under Pastos, we take this opportunity to clarify the distinction between Pastos and Hamilton. The District Court stated that “[i]t is very difficult... to see why the reasoning and limitations in Hamilton do not apply to routine post-arrest inventory searches.” We respectfully disagree. Hamilton applies to the warrantless search of a lost wallet to determine ownership, Hamilton, ¶ 46, whereas Pastos applies to “the routine, administrative inventory search of the personal property on or in the possession of the arrestee at the police station following a lawful arrest.” Pastos, 269 Mont. at 52, 887 P.2d at 204. Hamilton’s property posed no apparent danger; because she was not present either when her wallet was found or when it was turned in at the station, “there was no risk that Hamilton would pull a weapon out of her lost wallet.” Hamilton, ¶ 39. Moreover, as there had been no arrest and *219 detention of Hamilton, she had an expectation of privacy in her wallet “diminished only to the extent necessary for the police to determine ownership,” Hamilton, ¶ 31, unlike Pastos, whose expectation of privacy at the station house was more greatly reduced. Given that there generally is an expectation of privacy and no compelling safety interest when dealing with lost property, “the least intrusive means possible must be used to identify the owner of lost property, protect the contents of personal property for the owner, and to protect the public from claims for missing valuables.” Hamilton, ¶ 46. The least intrusive means are securing the contents of a lost wallet in an evidence bag and storing it in a secure place. Hamilton, ¶ 46. For routine inventory searches, however, the police are not required to use some method short of physically searching the arrestee’s possessions. Pastos, 269 Mont. at 51, 887 P.2d at 204.
¶24 The Dissent errs in juxtaposing inventory searches and searches incident to arrest. “[A]n administrative inventory search differs from [a search incident to arrest] in that its purpose is not to discover and preserve evidence, but rather, is to protect police and other prisoners from potential danger and to protect police and the arrestee by creating an accounting of personal items.” Hardaway, ¶ 53 (citing City of Helena v. Lamping, 221 Mont. 370, 372-73, 719 P.2d 1245, 1247 (1986)). The inventory search “is best described as a ‘routine administrative caretalting function,’ as opposed to an evidentiary or investigatory activity.” Hardaway, ¶ 15 (citation omitted). The underlying purposes of a search incident to arrest, on the other hand, are: (1) protecting the arresting officer from attack; (2) preventing the arrestee from escaping; (3) discovering and seizing the fruits of the crime; or (4) discovering and seizing any persons, instruments, articles, or things that the arrestee may have used in the commission of or which may constitute evidence of the offense. Section 46-5-102, MCA.
125 Because the searches have different purposes, their scopes also differ. Routine, administrative inventory searches are closely tailored to effectuate the underlying purposes of an inventory search when the scope is limited to the property, including closed containers, in the immediate possession of the arrestee at the time of arrest. See Pastos, 269 Mont. at 51-52, 887 P.2d at 204. Anything less intrusive would not adequately satisfy the purposes of creating an accounting of personal items and of protecting the police, the arrestee, and other prisoners from potential danger. The scope of a warrantless search incident to arrest — which typically occurs immediately upon arrest and not at the station house — “must be commensurate with its underlying *220 purpose of preventing an arrestee from using any weapons he or she may have, escaping, or destroying any incriminating evidence in his or her possession.” Hardaway, ¶ 40.
¶26 Different outcomes may arise despite seemingly similar facts depending on the type of search conducted, as the Dissent points out. See Dissent, ¶ 39. The search of the purse in State v. Graham, 271 Mont. 510, 898 P.2d 1206 (1995), would likely have been deemed valid had it been conducted as an inventory search pursuant to a routine, administrative procedure. However, nothing in our opinion in Graham suggests the existence of a routine inventory search policy at the station where the search was conducted. In fact, the State argued that Graham’s purse “was properly searched at the jail as an incident to her lawful arrest.” Graham, 271 Mont. at 513, 898 P.2d at 1208. As such, the requisites of § 46-5-102, MCA, necessarily governed this Court’s analysis in Graham. While, as the Dissent asserts, the facts in Graham are similar to the facts here, the underlying premise for the respective searches was wholly different.
¶27 We “must, necessarily, acknowledge the reality of the times in which we live.” Pastos, 269 Mont. at 48, 887 P.2d at 202. The “reality of violence and potential for violence in our society” that we acknowledged over twenty years ago has become more immediate and pronounced in the intervening years. The Pastos Court’s observation that “sadly, no citizen or property is, today, immune from attack by the deranged, the disaffected, the misguided, the terrorist or the zealot,” Pastos, 269 Mont. at 48, 887 P.2d at 202, especially applies to our post-September 11th world. However, safety concerns are not the only reason to uphold Pastos. From a procedural standpoint, we deem a standardized inventory search procedure applied uniformly to each arrestee who arrives at the station preferable to an ad hoc analysis by the officer on duty of every arrestee who comes through the door. An assessment of each person for the possible risk he or she might pose would by necessity be quick and subjective, and quite possibly wrong. Such an approach could also prompt complaints of selective enforcement or even bias. The routine procedure alleviates these issues, provides guidance to the officers assigned to perform the inventory search, and protects against allegations of theft or destruction of property. For all these reasons, we reaffirm our decision in Pastos.
CONCLUSION
¶28 For the foregoing reasons, we affirm the District Court’s denial of *221 Demontiney’s motion to suppress and dismiss.
CHIEF JUSTICE McGRATH, JUSTICES BAKER, McKINNON, RICE and DISTRICT JUDGE NEWMAN, sitting for former JUSTICE MORRIS concur.

 In his report, Deputy Martin noted that Demontiney held her purse tightly “as if she did not want us to discover what the contents of the purse were.” The prosecutor said Martin “perhaps [believed] there might have been evidence of another crime by the perpetrator,” but she “[did]n’t know” and “didn’t ask him.” Moreover, the District Court concluded that the “safety rationale seems particularly disingenuous in the case at bar as to the containers within Demontiney’s purse.”