JUSTICE NELSON
delivered the Opinion of the Court.
This is an appeal from a Fourth Judicial District Court, Missoula County, memorandum and order, denying defendant Nikos Pastos’ (Pastos) motion to suppress evidence and from the judgment dated August 30, 1993, adjudging him guilty of the offense charged. We affirm.
*45 The sole issue on appeal is whether the District Court erred in denying Pastos’ motion to suppress evidence discovered during an inventory search of his rucksack at the jail following his arrest.
FACTUAL AND PROCEDURAL BACKGROUND
The following facts are taken from the State’s motion and affidavit for leave to file the information and from the record on appeal.
On February 17,1992, Missoula City Police Officer Ed Gydas was on routine patrol when he observed Pastos, whom he knew from previous contacts, walking down South 5th East in Missoula. Gydas requested a warrants check and learned that there were active city warrants out for Pastos’ arrest. Gydas stopped Pastos, who was carrying a blue rucksack; after asking him for identification and checking his birthday, Gydas confirmed that Pastos was the person wanted on the city warrants. Pastos was arrested and was transported to the Missoula County Jail for booking. Pastos’ coat, a black bag and the blue rucksack were transported to the jail with him.
At the j ail, a routine booking inventory was conducted with respect to each of the items of Pastos’ property. A green army style pouch in the blue rucksack was found to contain four baggies of mushrooms. Police Detective Marty Ludeman transported the bags of mushrooms seized from Pastos’ rucksack to the Montana State Crime Lab. The mushrooms tested positively for hallucinogenic psilocybin, a controlled substance.
Pastos was charged with criminal possession of dangerous drugs in violation of § 45-9-102, MCA. He entered a plea of not guilty and, subsequently, moved to suppress the evidence obtained during the inventory search of his rucksack at the jail. The District Court denied the motion.
Pursuant to a plea bargain agreement, Pastos withdrew his not guilty plea and entered an Alford guilty plea, reserving his right to appeal the denial of his motion to suppress. The District Court accepted Pastos’ plea, adjudged him guilty of the charged offense, and deferred imposition of sentence for three years. Pastos appeals.
STANDARD OF REVIEW
We review the District Court’s conclusions of law in ruling on a motion to suppress evidence to determine whether the trial court’s interpretation and application of the law is correct. State v. McCarthy (1993), 258 Mont. 51, 55, 852 P.2d 111, 113; Steer Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.
*46 DISCUSSION
In this case we are called upon to determine whether a routine inventory search of an arrestee’s possessions conducted at the station house in conjunction with the booking process and in accordance with the law enforcement authority’s standard administrative policy or procedure, passes muster under the Montana Constitution.
In contending that such searches are unlawful, Pastos argues that Sections 10 and 11 of Article II of the Montana Constitution provide Montana citizens with a more expansive right of privacy than that afforded by the Fourth Amendment of the federal constitution or the penumbrae of the various amendments to the federal constitution. According to Pastos this broader right of privacy was violated by the search of his rucksack after he was placed in jail. Pastos contends that his right to privacy outweighs any governmental interest in the search of his rucksack, and that, therefore, this Court should order the trial court to suppress the evidence obtained by the police during the search. Pastos argues that our decision in State v. Sierra (1985), 214 Mont. 472, 692 P.2d 1273, is dispositive of the legal question presented.
The State counters that the District Court did not err in denying Pastos’ motion to suppress the evidence discovered during the inventory search because there is a compelling state interest in conducting such searches which outweighs Pastos’ privacy interest. Moreover, the State asserts that State v. LaMere (1987), 226 Mont. 323, 735 P.2d 511, a more recent case, and the case relied upon by the District Court in making its decision, overruled Sierra by implication and that under the principles enunciated in LaMere, the search was proper.
In discussing the question on appeal, we note, at the outset, that no evidence was presented to the District Court that the search of Pastos’ possessions was initiated for the purpose of discovering the fruits of other crimes or to gather evidence of the offense for which he was arrested. In fact, Pastos admitted during oral argument that his was a routine inventory search conducted at the station house pursuant to the law enforcement authority’s standardized police administrative procedure applicable to all persons arrested. We underscore that fact and emphasize that our opinion here is limited to those type of searches only.
We begin our analysis by setting forth the two sections of Article II of the Montana Constitution which are implicated here. Section 10 provides:
*47 The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
Section 11 provides:
The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.
Since a search and seizure was involved in this case, Section 11, is, obviously, pertinent. Notwithstanding, on appeal, Pastos argues that the search and seizure conducted here was unlawful in that his right of privacy under Section 10 was violated. In support of that argument he relies on our prior cases that have, for the most part, dealt with inventory searches in the context of Section 10. Accordingly, in view of the posture in which the question of law to be decided is presented to us, we will, likewise, focus our analysis in this opinion on Article II, Section 10.
In discussing Montana’s constitutional right of privacy, we have heretofore recognized at one and the same time the fundamental nature of that right, and that the right is not absolute under all circumstances. “The right of individual privacy is a fundamental constitutional right expressly recognized as essential to the well-being of our society. The constitutional guarantee of individual privacy is not absolute.” State, Etc. v. District Court, Etc. (1979), 180 Mont. 548, 555-56, 591 P.2d 656, 660. By its terms, Section 10 provides that the right of individual privacy shall not be infringed without a showing of a compelling state interest. Art. II, Sec. 10, Mont.Const.
We also recognize that when the government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effectuate only that compelling interest. Zablocki v. Redhail (1978), 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618.
Under such analysis, the legal question at issue then becomes: “Is there a compelling state interest which justifies a routine, administrative inventory search of the personal property on, or in the possession of the arrestee at the station house following a lawful arrest?” We answer this question in the affirmative, and conclude that, with regard to such searches, the compelling state interest is the protection of the arrestee, the police, other inmates, and persons and property in and about the station house from the harm and *48 potential for harm posed by weapons, dangerous instrumentalities and hazardous substances that might be concealed on or in the possessions of the arrestee. There are also other subordinate interests which support, but which do not, in and of themselves, justify an inventory search of personal property found on or in the possession of a lawfully arrested person.
In discussing the compelling state interest which we conclude justifies the search at issue here, we first must, necessarily, acknowledge the reality of the times in which we live. There is little doubt that we live in a violent society. Hardly a week goes by without news reports of workers, public officials, employees and other innocent citizens being injured or killed in indiscriminate assaults in offices, work places, schools, restaurants, courtrooms, police stations and other private or public institutions. Whether it be the White House or the doctor’s office, sadly, no citizen or'property is, today, immune from attack by the deranged, the disaffected, the misguided, the terrorist or the zealot.
The reality of violence and the potential for violence in our society dictates that it is a proper and legitimate concern of law enforcement officers that an arrestee may have concealed on his or her person or in his or her possession weapons, dangerous instrumentalities such as explosives or incendiary devices or hazardous substances, which could be used to injure the police, fellow inmates, employees and members of the public in and about the station house.
That fact was recognized by the U.S. Supreme Court in Illinois v. Lafayette (1983), 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65, wherein the court observed:
Arrested persons have also been known to injure themselves — or others — with belts, knives, drugs, or other items on their person while being detained. Dangerous instrumentalities — such as razor blades, bombs, or weapons — can be concealed in innocent-looking articles taken from the arrestee’s possession.
Lafayette, 462 U.S. at 646, 103 S.Ct. at 2609. This Court has acknowledged those same concerns. See, City of Helena v. Lamping (1986), 221 Mont. 370, 373, 719 P.2d 1245; LaMere, 735 P.2d at 512.
We agree with the court in Lafayette, that
[t]he bare recital of these mundane realities justifies reasonable measures by police to limit these risks — either while the items are in police possession or at the time they are returned to the arrestee upon his release. Examining all the items removed from the arrestee’s person or possession and listing or inventorying them is *49 an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer’s subjective concerns. Citing United States v. Robinson (1973) 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427.
Lafayette, 462 U.S. at 646, 103 S.Ct. at 2609-10.
Notwithstanding, Pastos argues that:
“[p]olice do not need to guard against danger from closed packages with a complete inventory search, either. To determine what kind of search police should conduct, we must first determine what danger could possibly lurk inside an arrestee’s backpack, luggage, or other closed container ... We must remember we are talking about danger from items carried in separate packages by ordinary citizens.”
We disagree. It is both impractical and unreasonable to expect law enforcement officers to be responsible for, among the myriad of tasks to be completed during post-arrest, assessing whether an arrestee is an “ordinary citizen” or one who is capable of or likely to be in possession of weapons, dangerous instrumentalities or hazardous substances which may harm him or herself or others. The simple fact is the police deal with a wide variety of people, many of whom are very dangerous and who, as a matter of course or for some purpose related to a particular criminal endeavor, conceal weapons, dangerous instrumentalities or hazardous substances in innocent looking containers such as, for example, suitcases, rucksacks, purses and wallets. It is both unrealistic and unsafe for the police to fail to take routine, administrative steps to protect themselves, the arrestee and others in the station house from the actual or potential danger such persons pose.
Pastos, however, argues, “[i]f an arrestee does carry a weapon in a separate closed container, that weapon does not pose a threat to authorities once the item is separated from the suspect.” Again, we disagree. While the weapon may not pose a threat while the arrestee is incarcerated, it cannot be disputed that it only takes seconds for an arrestee, on his or her release, to open a closed container, retrieve the weapon and use it against a police officer or another person in the station house. Moreover, an explosive, incendiary device or hazardous substance concealed in the arrestee’s possessions poses a continuous threat to the safety of persons and property while stored on the station house premises. As stated by Justice Marshall in his concurrence in Lafayette, joined by Justice Brennan, “[t]he practical neces *50 sities of securing persons and property in a jailhouse setting justify an inventory search as part of the standard procedure incident to incarceration.” Lafayette, 462 U.S. at 649, 103 S.Ct. at 2611.
Pastos also asserts that the “less intrusive means rule,” discussed in State v. Sawyer (1977), 174 Mont. 512, 571 P.2d 1131, and in Sierra, should be applied to the inventory of an arrestee’s possessions upon his or her incarceration in jail. Pastos contends that, as a less intrusive means of dealing with the sorts of potential problems referred to above, the police could have secured his rucksack for safekeeping, could have inventoried valuable items found in plain view, could have marked the rucksack in a manner from which one could determine whether there had been tampering and then could have placed the rucksack in an appropriate area for safekeeping during the arrestee’s detention.
Keeping in mind that the protection of the arrestee, the police and other persons in and about the station house from the potential harm posed by weapons, dangerous instrumentalities and hazardous substances concealed on or in the arrestee’s possessions is the primary justification for administrative inventory searches, as a practical matter, there are several problems inherent in the “less intrusive means” approach.
First, if, as pointed out above, the closed container contains a weapon, it can take but a matter of seconds for the arrestee to retrieve the weapon and use it against an unsuspecting person. This concern alone vitiates Pastos’ argument that a less intrusive means of conducting an inventory search will accomplish the State’s goal of safeguarding persons and property in the station house. A search of a closed container found on or in the possession of the arrestee is the least intrusive method of alleviating any risk from weapons and dangerous instrumentalities that may be used by an arrestee upon his or her release from the jail.
Second, if an arrestee is carrying a concealed bomb, explosive or incendiary device, there is little, short of a physical search of the arrestee’s possessions, that the police can do to protect against the potential harm inherent in such a situation. While Pastos suggested at oral argument that the police could store prisoners’ personal possessions in a bomb-proof room, it is not likely that Montana police stations and sheriff’s offices would have access to such a room and even less likely that city councils, county commissioners and taxpayers would be willing to finance the cost to construct that type of *51 facility. Again, a physical inventory search is the most practical and least intrusive method of dealing with the problem.
Third, it is impractical and unreasonable to expect the police to make decisions on a daily basis about which containers to search and what, if any, is the least intrusive means available to inventory an arrestee’s personal property on or in his or her possession. Lafayette, 462 U.S. at 648,103 S.Ct. at 2610-11. “[I]t would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit.” Lafayette, 462 U.S. at 648, 103 S.Ct. at 2610. The potential for danger alone justifies the inventory of items found on or in the possession of a lawfully arrested person at the station house. “[A] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.” Lafayette, 462 U.S. at 648, 103 S.Ct. at 2610-11, citing New York v. Belton (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768. To a certain extent, we must defer to police departments in their development of standardized administrative procedures which will best serve to protect the interests of the arrestee, the police, others incarcerated in jail, and society at large. Lafayette, 462 U.S. at 648, 103 S.Ct. at 2610-11.
While Pastos argues, correctly, that the right of privacy can only be infringed by a compelling state interest closely tailored to effectuate that interest, it does not follow that the less intrusive means rule mandates that the police use some method short of physically searching the arrestee’s possessions. The routine, administrative inventory search of the personal property on or in the possessions of the arrestee at the police station following arrest is closely tailored to effectuate the compelling interest of safeguarding persons and property in the station house from weapons, dangerous instrumentalities and hazardous substances which might be concealed in the arrestee’s possessions.
Under Article II, Section 10, an arrestee has an expectation of and constitutional right of privacy in the personal property on his or her person or in his or her possessions while at the police station. However, that privacy interest is not absolute. We conclude that the State has a legitimate and compelling interest in protecting, to the extent possible, the safety of the arrestee and other persons in and about the station house from weapons, dangerous instrumentalities, and hazardous substances which might be concealed on or in the personal property and possessions of the arrestee. We hold that this *52 compelling interest justifies the routine, administrative inventory search of the personal property on or in the possession of the arrestee at the police station following a lawful arrest.
While the State’s interest in protecting the arrestee, the police and other persons in and about the station house from harm is, alone, sufficient to justify the sort of routine, administrative inventory search at issue here, the cases also discuss other purposes which serve to justify — though, we conclude, to a subordinate extent — such searches. We reiterate those briefly in the interest of fully discussing this issue.
Courts generally recognize that a state also has an interest in protecting an arrestee’s property by accounting for any money, articles or items he or she may have in his or her possession at the time he or she is placed in jail. LaMere, 735 P.2d at 513; Lamping, 719 P.2d at 1247; Lafayette, 462 U.S. at 646,103 S.Ct. at 2609-10. As stated in Lafayette, “[i}t is not unheard of for persons employed in police activities to steal property taken from arrested persons. ...’’Lafayette, 462 U.S. at 646, 103 S.Ct. at 2609. The inventory search is a reasonable way to ensure the protection of an arrestee’s property during his or her detention. Colorado v. Bertine (1987), 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739. “Knowledge of the precise nature of the property help[s] guard against claims of theft, vandalism, or negligence.” LaMere, 735 P.2d at 513, citing Bertine, 479 U.S. at 372-73, 107 S.Ct. at 741-42. See also State v. Swanson (1986), 222 Mont. 357, 362, 722 P.2d 1155, 1158, (one of the purposes of inventory searches is the safekeeping of prisoners’ property, citing Lafayette.)
Courts also acknowledge that a former arrestee may bring false claims for items taken while in the custody of the police. “A standardized procedure for making a fist or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person.” Lafayette, 462 U.S. at 646, 103 S.Ct. at 2609. The police cannot protect themselves against false claims if they do not know the extent of the arrestee’s possessions they have in safekeeping. See also, Swanson, 722 P.2d at 1158.
In support of his position, Pastos argues throughout his brief that Sierra is on all fours with and should control this Court’s disposition of the instant case. He also argues that LaMere, which is in conflict with the principles enunciated in Sierra, should be overruled. As pointed out above, the State maintains that LaMere implicitly overruled Sierra and controls the disposition of the instant case. In view *53 of the apparent conflict in our cases dealing with the subject of inventory searches, we discuss them with a view to clarifying our case law on this subject.
We first analyzed a search and seizure issue in light of the Montana right of privacy, Article II, Section 10, in Sawyer. That case, unlike the present, involved a routine inventory search of the defendant’s automobile following his arrest and detention on reckless driving charges. The search uncovered amphetamines under the driver’s seat of the car. Sawyer, 571 P.2d at 1132. Rejecting a Fourth Amendment analysis under South Dakota v. Opperman (1976) 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000, we, instead, concluded that the inventory search conducted by the police significantly infringed the defendant’s right of privacy under the Montana Constitution. Sawyer, 571 P.2d at 1134. We held that neither protecting the contents of the vehicle for the benefit of the owner, (where he had the ability to, but had not consented to the search,) nor protecting the police from claims for lost property, (where as “gratuitous” bailees, the police owed the defendant only a duty of “slight care” in protecting his property,) justified the warrantless search. Sawyer, 571 P.2d at 1134.
Since Sawyer involved the inventory search of an automobile, we necessarily did not discuss or address the different and more serious concerns which justify the routine booking search at issue in the instant case. Instead, our focus in Sawyer was on protecting the defendant’s greater constitutional right of privacy in the face of a less compelling need to protect his property in the hands of the police.
In Sierra, the defendant and a friend were arrested by the Livingston police and were taken to the station house to be detained until it could be determined whether they were legally in the United States. During the booking procedure defendant was ordered to empty his pockets. In doing so he removed a small quantity of a substance that turned out to be marijuana. Immediately afterwards, his suitcase, which he carried at the time of his arrest, was opened to reveal a substantial quantity of marijuana. Sierra, 692 P.2d at 1275. The trial court ruled that the marijuana removed from the defendant’s pocket was admissible, while that discovered in his suitcase was not. Sierra, 692 P.2d at 1275.
On appeal, we concluded that a means ‘less intrusive” than opening the defendant’s suitcase was required under the circumstances; that the police should not have opened the closed suitcase; and that the search of the suitcase violated the defendant’s privacy interests under Article II, Section 10, of the Montana Constitution. Sierra, 692 *54 P.2d at 1275. Citing our decision in Sawyer and to our application of Article II, Section 10 in that case, we, again, required that the police use the less intrusive means of separating the defendant from his possessions and cataloging, rather than searching, the arrestee’s personal property. Sierra, 692 P.2d at 1276.
Significantly, however, aside from a passing reference to the “danger from contents of uninventoried packages” in our rejection of the Fourth Amendment approach of Lafayette, we did not discuss or analyze whether the State might, under Article II, Section 10, of the Montana Constitution, demonstrate a compelling interest in protecting the police, the arrestee and other persons in and about the station house from weapons, dangerous instrumentalities and hazardous substances concealed in the arrestee’s personal possessions, which would, in turn, justify a routine booking search.
Following Sierra, we decided Lamping. In that case, the defendant, under arrest at the county jail, was subjected to a routine booking search of his personal property. While searching Lamping’s person, the jailer pulled out of Lamping’s shirt pocket what appeared to be a crumpled, open cigarette pack. On inspecting the pack, the jailer recovered a marijuana cigarette, which the defendant subsequently moved to suppress. Lamping, 719 P.2d at 1246-47. We distinguished Sierra on its facts noting a difference “between searches of the person [Lamping] and searches of possessions within an arrestee’s immediate control [Sierra].”Lamping, 719 P.2d at 1247.
While Lamping involved the search of an article of personal property that the defendant would have been allowed to keep on his person in his jail cell, rather than an article which the police would have retained until his release from custody, we, nevertheless, for the first time acknowledged that “[d]angerous instrumentalities can be concealed in innocent looking articles taken from an arrestee’s possession, [and that] [t]he state has a compelling interest in protecting prisoners from potential danger.” Lamping, 719 P.2d at 1247. While we did not otherwise discuss or analyze whether, under Article II, Section 10, that same compelling interest might also extend to the protection of the police and other persons in and about the station house and cover weapons, dangerous instrumentalities and hazardous substances concealed in possessions of the arrestee which were to be stored at the station house until his release, it was unnecessary that we do so under the facts of that case.
In LaMere, we reversed the trial court’s granting of the defendant’s motion to suppress evidence seized during a routine inventory search *55 of his person prior to his incarceration at the county j ail. At the station house, following LaMere’s arrest, two items of personal property were taken from him, were opened, were searched and evidence seized therefrom. One item was a leather pouch located in the inside pocket of defendant’s jacket; the other was a bank money bag removed from under the defendant’s pants leg. Both items were found to contain controlled substances. LaMere, 735 P.2d at 511.
In granting the defendant’s motion to suppress, the trial court relied on Sierra. On appeal, we were asked to reconsider our decision in that case in light of Lafayette; and, sua sponte, we also raised a then recent case not argued by the parties, Bertine, an automobile inventory search case. LaMere, 735 P.2d at 512. In reversing the district court, we held that Lamping controlled, again pointing out that “dangerous instrumentalities can be concealed in innocent looking articles taken from an arrestee’s possession and [that] the State has a compelling interest in protecting prisoners from potential dangers and [in protecting] the defendant and the officer by accounting for any money the person has.” LaMere, 735 P.2d at 512. We also specifically adopted the Bertine rationale, that knowledge of the precise nature of (and securing) the arrestee’s property protected against unauthorized interference and claims of theft, vandalism or negligence. Moreover, we observed that “[s]uch knowledge also helped to avert any danger to police or others that may have been posed by the property.” LaMere, 735 P.2d at 513.
While, as regards the instant case, the State argues that LaMere is dispositive, we conclude that is not necessarily clear. If we assume that the two containers taken from LaMere were not going to be returned to him but were going to be stored until his release, LaMere is factually more akin to Sierra. If, on the other hand, the two items were going to be returned to LaMere, then his case is factually closer to Lamping. Our decision does not indicate the intended disposition of the two articles of personal property although we concluded that Lamping controlled. LaMere, 735 P.2d at 512.
Moreover, we reached our decision in LaMere without any reference to or analysis of the defendant’s right of privacy under Article II, Section 10. We simply adopted the rationale of Bertine, an automobile inventory search case as the justification for the inventory search of defendant’s person and possessions. Bertine, of course, runs directly counter to our decision in Sawyer, which was an automobile search case and in which we held that the defendant’s Article II, Section 10, right to privacy, had been violated by the warrantless *56 inventory search. We did not overrule Sawyer notwithstanding our adoption of the Bertine rationale. Furthermore, although the State, here concludes (as did Justice Hunt in his LaMere dissent) that we overruled Sierra in LaMere, our opinion does not reflect that, if that was our intention at the time.
Finally, since we did not refer to Article II, Section 10, in LaMere, we had no occasion to focus on whether there was any compelling state interest that justified the inventory search of the defendant’s person and possessions. We simply referenced the passages from Lamping and Bertine mentioned above.
Our decision in State v. Holzapfel (1988), 230 Mont. 105, 748 P.2d 953, followed LaMere. In that case, following Holzapfel’s arrest on an outstanding warrant for drug charges, he was transported to the county jail and was booked. Without obtaining a search warrant, a law enforcement officer took the defendant’s wallet from the jailer and examined it under ultraviolet light, finding traces of detection powder. The defendant’s hands were thereafter likewise examined and traces of detection powder were found. Holzapfel moved to suppress the results of the post-arrest, nonconsensual warrantless search of his wallet. Holzapfel, 748 P.2d at 109.
In affirming the trial court’s denial of the motion to suppress, we determined that the search was justified as incident to the defendant’s arrest, citing various Ninth Circuit cases, and that the defendant’s constitutional privacy guarantees were satisfied on the basis of Lamping’s distinction between searches of the person and objects immediately associated with the person and searches of possessions within the arrestee’s immediate control.
A close reading of Holzapfel, however, leads to the conclusion that the search at issue in that case was not conducted as a routine, inventory booking search, but, rather, as a search for specific evidence of the offense with which the defendant was charged. Accordingly, and without commenting on the rationale of Holzapfel as applied to its facts, we conclude that case has no application here.
In view of the above discussion of our prior decisions and in view of our holding in the instant case, we take this opportunity to clarify our prior case law on the subject of routine inventory searches. First, as pointed out initially, our decision here is not applicable to routine inventory searches of vehicles. Because of the defendant’s greater State constitutional right of privacy, our decision in Sawyer continues to be the law in this State as regards routine automobile inventory searches where the defendant has been arrested and his or her vehicle *57 impounded and where there are no exigent circumstances or other recognized exceptions from the warrant requirement which justify a warrantless search.
Second, the police may conduct a routine, administrative inventory search at the station house of the arrestee and of closed containers on his or her person or in his or her immediate possession at the time of his arrest. Such a search is authorized if conducted pursuant to a standardized policy or procedure adopted by the police and routinely utilized in the booking process. In Montana, such a search is in derogation of the arrestee’s constitutional right to privacy under Article II, Section 10, but is, nevertheless, justified on the basis of the compelling state interest in protecting the arrestee, the police, other inmates and persons and property in and about the station house from the harm and potential for harm posed by weapons, dangerous instrumentalities and hazardous substances which might be concealed on the person of the arrestee or in closed containers on his or her person or in his or her possessions.
Third, to the extent that our decision in Sierra is inconsistent with our opinion here, that case is expressly overruled to the extent of such inconsistencies. Moreover, while Lamping and LaMere are consistent as to result with our decision here, henceforth, the legal principles set forth in this opinion shall govern cases involving routine station house hooking searches.
In conclusion and based on our discussion above, we hold that the District Court’s denial of Pastos’ motion to suppress should be and is, hereby, AFFIRMED.
CHIEF JUSTICE TURNAGE, JUSTICES HARRISON and WEBER concur.