DA 12-0453

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 66

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

NINA M. DEMONTINEY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 11-030
Honorable Daniel A. Boucher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Wade Zolynski, Chief Appellate Defender, Eileen A. Larkin (argued),
Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar (argued),
Assistant Attorney General, Helena, Montana

            Gina Dahl, Hill County Attorney, Havre, Montana

Argued and Submitted: January 29, 2014
Decided: March 11, 2014

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1   Nina Demontiney (Demontiney) appeals from an order of the Twelfth Judicial District Court, Hill County, denying her motion to suppress and dismiss. We affirm.

## ISSUE

¶2   A restatement of the dispositive issue on appeal is:

¶3   *Did the District Court err in denying Demontiney's motion to suppress and dismiss?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4   On January 5, 2010, Hill County Sheriff Deputies Stephen Martin and Pete Seymour responded to a report that two women, one of whom was Demontiney, were being detained at Wal-Mart after exiting the store with stolen purses. After conducting a warrant check, the deputies learned that Demontiney had an outstanding city warrant for $310. The deputies handcuffed both women, searched their persons for weapons, and escorted them to a patrol vehicle to transport them to the Hill County Detention Center. Demontiney asked to return to her vehicle in the Wal-Mart parking lot to drop off her purse; the deputies denied this request. Demontiney's purse was transported to the Detention Center in another patrol car.

¶5   At the Detention Center, Officer Eckhardt conducted an inventory search of Demontiney's purse and found a plastic Wonder Bread sandwich container containing 39 bags of a white rock-like substance, weighing approximately 21.5 grams in total. He also found $1,845.00 in cash, two razor blades, a straw, a pill grinder containing a Hydrocodone pill, and a piece of paper with the following notation: "1 $1,500.00;

2

bundle 2 $2,400.00; coke $2,200.00; and weed $425.00." The white rock-like substance tested positively for cocaine.

¶6 The State subsequently charged Demontiney with criminal possession of dangerous drugs with intent to distribute, a felony, in violation of § 45-9-103, MCA (Count I), and criminal possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA (Count II). Demontiney filed a motion to suppress or dismiss, and the District Court held a hearing on the motion on February 6, 2012. Deputy Seymour and Officer Eckhardt testified, and Demontiney and the State presented arguments about the lawfulness of the search. On February 22, 2012, the District Court denied Demontiney's motion. During a change of plea hearing on March 27, 2012, Demontiney pleaded guilty to both counts and expressly reserved the right to appeal the denial of her motion to suppress and dismiss. The District Court accepted Demontiney's admission and change of plea. On May 14, 2012, the District Court sentenced Demontiney to three years, deferred, for Count I and six months with all but three days suspended for Count II.

¶7 Demontiney timely appealed the denial of her motion. She argues that under these facts, the State did not have a compelling interest outweighing her right of privacy in her purse and the closed containers within it. Demontiney further argues that the search was unreasonable and violated her rights under Article II, Sections 10 and 11 of the Montana Constitution because the officers conducted the search for an investigatory purpose. Demontiney requests that we overturn *State v. Pastos*, 269 Mont. 43, 887 P.2d 199 (1994), and adopt the standard set forth in *State v. Sierra*, 214 Mont. 472, 692 P.2d 1273

(1985), *overruled in part*, *Pastos*, 269 Mont. at 57, 887 P.2d at 208, and *Reeves v. State*, 599 P.2d 727 (Alaska 1979).

¶8    The State counters that the search was permissible under *Pastos* because inventory searches are an established exception to the warrant requirement, safety is a compelling state interest, and the search satisfied the requirements for an inventory search. The State urges us to reaffirm *Pastos*.

## STANDARD OF REVIEW

¶9    When reviewing a district court's ruling on a motion to suppress evidence, we determine whether the court's underlying factual findings are clearly erroneous and whether the court's interpretation and application of the law are correct. *State v. Morrisey*, 2009 MT 201, ¶ 14, 351 Mont. 144, 214 P.3d 708 (citation omitted). A court's findings are clearly erroneous if they are not supported by substantial evidence or if this Court's review of the record leaves us with a definite or firm conviction that a mistake has been made. *Morrisey*, ¶ 14 (citation omitted).

## DISCUSSION

¶10   *Did the District Court err in denying Demontiney's motion to suppress and dismiss?*

¶11   The Fourth Amendment of the United States Constitution provides the traditional protections against unwarranted searches; however, Montanans have a heightened expectation of privacy pursuant to Article II, Sections 10 and 11 of the Montana Constitution. *State v. Hamilton*, 2003 MT 71, ¶ 14, 314 Mont. 507, 67 P.3d 871. Article II, Section 10 states: "The right of individual privacy is essential to the well-being

4

of a free society and shall not be infringed without the showing of a compelling state interest." Section 11 provides:

> The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

¶12 "In discussing Montana's constitutional right of privacy, we have heretofore recognized at one and the same time the fundamental nature of that right, and that the right is not absolute under all circumstances." *Pastos*, 269 Mont. at 47, 887 P.2d at 202. We have recognized that "an arrestee has an expectation of and constitutional right of privacy in the personal property on his or her person or in his or her possessions while at the police station." *Pastos*, 269 Mont. at 52, 887 P.2d at 204. However, "[t]he expectations of privacy of an individual taken into police custody necessarily are of a diminished scope," a significant factor which the Dissent wholly fails to acknowledge in its analysis of Demontiney's privacy interests. *Maryland v. King*, ___ U.S. ___, 133 S. Ct. 1958, 1978, 1980 (2013) (citation omitted; internal quotation marks omitted) (holding that the processing of an arrestee's DNA sample did not intrude on the arrestee's privacy in a way that would make his DNA identification unconstitutional when he was already in valid police custody for a serious offense supported by probable cause and the DNA sample was taken as a routine booking procedure for serious offenders).

¶13 When the State intrudes upon a fundamental right, it must demonstrate a compelling state interest for doing so that is closely tailored to effectuate only that compelling interest. *Pastos*, 269 Mont. at 47, 887 P.2d at 202 (citation omitted). In

5

*Pastos,* this Court concluded that there is a compelling state interest justifying a routine, administrative inventory search of the personal property on or in the possession of the arrestee at the station house following a lawful arrest. "[T]he compelling state interest is the protection of the arrestee, the police, other inmates, and persons and property in and about the station house from the harm and potential for harm posed by weapons, dangerous instrumentalities and hazardous substances that might be concealed on or in the possessions of the arrestee." *Pastos*, 269 Mont. at 47-48, 887 P.2d at 202.

¶14 Demontiney requests that we overrule our decision in *Pastos*. Demontiney argues that the *Pastos* Court should have analyzed inventory searches under Article II, Section 11 because "[t]he heightened protections provided in Article II, Sections 10 and 11 require the State to use less intrusive means of inventory searches for any property in closed containers that will be stored while an arrestee is in jail and will be returned upon release." The State maintains that this argument is unfounded as "it is the operation of [S]ection 10 upon [S]ection 11 that distinguishes Montana's jurisprudence from federal Fourth Amendment rights."

¶15 In *Pastos*, this Court set forth Sections 10 and 11, noted that Section 11 was "obviously" pertinent, and focused its analysis on Section 10 "in view of the posture in which the question of law to be decided is presented to us." *Pastos*, 269 Mont. at 47, 887 P.2d at 202. The fact that the Court focused on Section 10 does not constitute grounds for overruling the decision. While Article II, Section 11 mirrors the federal Fourth Amendment, Section 10 has no federal constitutional counterpart and grants Montana citizens a specific right to privacy. It is the language in Section 10 that is the "unique

6

constitutional language assur[ing] citizens a greater right to privacy and broader protections." *State v. Hardaway*, 2001 MT 252, ¶ 34, 307 Mont. 139, 36 P.3d 900; *see e.g. State v. Bassett*, 1999 MT 109, ¶ 42, 294 Mont. 327, 982 P.2d 410 ("Our conclusion that Bassett had a reasonable expectation of privacy is buttressed by the fact that Montanans have heightened expectations of privacy, as evidenced by the specific protection given that right under Article II, Section 10 of Montana's Constitution.").

¶16     As we observed in *Pastos*, there are three problems inherent in the "less intrusive means" approach that Demontiney urges us to adopt: (1) if a closed container contains a weapon, an arrestee can retrieve the weapon and use it in a matter of seconds; (2) if an arrestee is carrying a concealed bomb, explosive or incendiary device, there is little that the police can do against the potential harm inherent in such a situation short of a physical search of the arrestee's possessions; and (3) it is impractical and unreasonable to expect the police to make decisions on a daily basis about which containers to search and what the least intrusive means would be in each situation. *Pastos*, 269 Mont. at 50-51, 887 P.2d at 204. Though we listed these problems, we did not expressly reject the "less intrusive means" approach but instead concluded that it would be difficult to fashion a "less intrusive means" of conducting the search of a closed container than opening it. *See Pastos*, 269 Mont. at 51, 887 P.2d at 204 ("[I]t does not follow that the less intrusive means rule mandates that the police use some method short of physically searching the arrestee's possessions.").

¶17     "Although *stare decisis* is not a rigid doctrine that forecloses the reexamination of cases when necessary, weighty considerations underlie the principle that courts should

not lightly overrule past decisions." *Certain v. Tonn*, 2009 MT 330, ¶ 19, 353 Mont. 21, 220 P.3d 384 (quotation marks omitted; internal citation omitted). "Faced with viable alternatives, *stare decisis* provides the 'preferred course.'" *Certain*, ¶ 19 (citation omitted). We decline to overrule a decision that has been in effect for over twenty years and has provided a bright line rule for law enforcement. Because we still find the reasoning in *Pastos* persuasive, perhaps even more so today given the "reality of the times in which we live," we reaffirm our conclusion in *Pastos* that "[t]he routine, administrative inventory search of the personal property on or in the possessions of the arrestee[, including closed containers,] at the police station following arrest is closely tailored to effectuate the compelling interest of safeguarding persons and property in the station house from weapons, dangerous instrumentalities and hazardous substances which might be concealed in the arrestee's possessions." *Pastos*, 269 Mont. at 48, 51-52, 887 P.2d at 202, 204.

¶18   We must now decide whether this search was valid as an inventory search under *Pastos*. Demontiney argues that her case is factually distinguishable from *Pastos* because: (1) her purse was not in her immediate possession; (2) the purse was transported to the police station separately from her and over her objection; and (3) there was evidence that the search was conducted for investigatory purposes instead of as part of routine booking procedure.

¶19   We held in *Pastos* that property in the "immediate possession" of the arrestee at the *time of arrest* may be subject to a valid inventory search. *Pastos*, 269 Mont. at 57, 887 P.2d at 208. Demontiney's purse was on the floor next to her at the store when the

8

deputies arrived. Because Demontiney was taken into custody at Wal-Mart, the record indicates that the purse was in her "immediate possession" at the time of arrest. Thus, it is immaterial that she objected to the deputies transporting the purse, that the purse was transported in a separate vehicle, and that the purse was not in her possession at the station. *See State v. Boswell*, 804 P.2d 1059, 1062 (N.M. 1991) ("The wallet, although on defendant's person at the time of arrest, was not in his possession immediately prior to his incarceration. However, the concerns underlying the reasonableness of an in-station inventory search justify the officer's return to the store to retrieve the wallet and its subsequent inventory.").

¶20 Law enforcement officers are not required to individually assess the risk posed by each arrestee before conducting an inventory search, *Pastos*, 269 Mont. at 49, 887 P.2d at 203, and an inventory search is valid even if there may be an investigative motive. *See U.S. v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993) ("[T]he department's policy was to search everything; the officer had no discretion. Because of this, the presence of an investigative motive does not invalidate the inventory search."). In *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605 (1983), a unanimous United States Supreme Court agreed that:

> At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the station house. A standardized procedure for making a list or inventory as soon as reasonable after reaching the station

9

house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person.

*Lafayette*, 462 U.S. at 646, 103 S. Ct. at 2609.

¶21 The Court went on to observe that dangerous instrumentalities, such as razor blades, bombs, or weapons, can be concealed in articles taken from the possession of the arrestee. *Lafayette*, 462 U.S. at 646, 103 S. Ct. at 2609. For these reasons, the Court deemed the inventory search "an entirely reasonable administrative procedure." *Lafayette*, 462 U.S. at 646, 103 S. Ct. at 2610.

¶22 The Dissent argues that Demontiney's property posed no actual danger. Dissent, ¶ 39. Of course, it is easy to make this determination in hindsight. As we noted in *Pastos*, however, citing *Lafayette*, "[i]t is immaterial whether the police actually fear any particular package or container; the need to protect against [the above-referenced risks] arises independently of a particular officer's subjective concerns." *Pastos*, 269 Mont. at 49, 887 P.2d at 203 (citing *Lafayette*, 462 U.S. at 646, 103 S. Ct. at 2610 (citation omitted)). Though a review of the record suggests there may have been an investigatory purpose for the search,[1] there was clearly a standardized procedure in place providing for the search of the possessions of all arrestees at the station, and the evidence indicates the search occurred pursuant to this routine procedure during Demontiney's booking for the shoplifting crime. At the jail, Demontiney asked the detention officer if he "was going to

---

[1] In his report, Deputy Martin noted that Demontiney held her purse tightly "as if she did not want us to discover what the contents of the purse were." The prosecutor said Martin "perhaps [believed] there might have been evidence of another crime by the perpetrator," but she "[did]n't know" and "didn't ask him." Moreover, the District Court concluded that the "safety rationale seems particularly disingenuous in the case at bar as to the containers within Demontiney's purse."

search her purse," and he "said yes, it was standard procedure." We therefore conclude that the search of Demontiney's purse and the enclosed containers was a valid inventory search.

¶23    Having concluded that this was a valid inventory search under *Pastos*, we take this opportunity to clarify the distinction between *Pastos* and *Hamilton*. The District Court stated that "[i]t is very difficult . . . to see why the reasoning and limitations in *Hamilton* do not apply to routine post-arrest inventory searches." We respectfully disagree. *Hamilton* applies to the warrantless search of a lost wallet to determine ownership, *Hamilton*, ¶ 46, whereas *Pastos* applies to "the routine, administrative inventory search of the personal property on or in the possession of the arrestee at the police station following a lawful arrest." *Pastos*, 269 Mont. at 52, 887 P.2d at 204. Hamilton's property posed no apparent danger; because she was not present either when her wallet was found or when it was turned in at the station, "there was no risk that Hamilton would pull a weapon out of her lost wallet." *Hamilton*, ¶ 39. Moreover, as there had been no arrest and detention of Hamilton, she had an expectation of privacy in her wallet "diminished only to the extent necessary for the police to determine ownership," *Hamilton*, ¶ 31, unlike Pastos, whose expectation of privacy at the station house was more greatly reduced. Given that there generally is an expectation of privacy and no compelling safety interest when dealing with lost property, "the least intrusive means possible must be used to identify the owner of lost property, protect the contents of personal property for the owner, and to protect the public from claims for missing valuables." *Hamilton*, ¶ 46. The least intrusive means are securing the contents of a lost wallet in an evidence bag and storing it

11

in a secure place. *Hamilton*, ¶ 46. For routine inventory searches, however, the police are not required to use some method short of physically searching the arrestee's possessions. *Pastos*, 269 Mont. at 51, 887 P.2d at 204.

¶24 The Dissent errs in juxtaposing inventory searches and searches incident to arrest. "[A]n administrative inventory search differs from [a search incident to arrest] in that its purpose is not to discover and preserve evidence, but rather, is to protect police and other prisoners from potential danger and to protect police and the arrestee by creating an accounting of personal items." *Hardaway*, ¶ 53 (citing *City of Helena v. Lamping*, 221 Mont. 370, 372-73, 719 P.2d 1245, 1247 (1986)). The inventory search "is best described as a 'routine administrative caretaking function,' as opposed to an evidentiary or investigatory activity." *Hardaway*, ¶ 15 (citation omitted). The underlying purposes of a search incident to arrest, on the other hand, are: (1) protecting the arresting officer from attack; (2) preventing the arrestee from escaping; (3) discovering and seizing the fruits of the crime; or (4) discovering and seizing any persons, instruments, articles, or things that the arrestee may have used in the commission of or which may constitute evidence of the offense. Section 46-5-102, MCA.

¶25 Because the searches have different purposes, their scopes also differ. Routine, administrative inventory searches are closely tailored to effectuate the underlying purposes of an inventory search when the scope is limited to the property, including closed containers, in the immediate possession of the arrestee at the time of arrest. *See Pastos*, 269 Mont. at 51-52, 887 P.2d at 204. Anything less intrusive would not adequately satisfy the purposes of creating an accounting of personal items and of

12

protecting the police, the arrestee, and other prisoners from potential danger. The scope of a warrantless search incident to arrest—which typically occurs immediately upon arrest and not at the station house—"must be commensurate with its underlying purpose of preventing an arrestee from using any weapons he or she may have, escaping, or destroying any incriminating evidence in his or her possession." *Hardaway*, ¶ 40.

¶26 Different outcomes may arise despite seemingly similar facts depending on the type of search conducted, as the Dissent points out. *See* Dissent, ¶ 39. The search of the purse in *State v. Graham*, 271 Mont. 510, 898 P.2d 1206 (1995), would likely have been deemed valid had it been conducted as an inventory search pursuant to a routine, administrative procedure. However, nothing in our opinion in *Graham* suggests the existence of a routine inventory search policy at the station where the search was conducted. In fact, the State argued that Graham's purse "was properly searched at the jail as an incident to her lawful arrest." *Graham*, 271 Mont. at 513, 898 P.2d at 1208. As such, the requisites of § 46-5-102, MCA, necessarily governed this Court's analysis in *Graham*. While, as the Dissent asserts, the facts in *Graham* are similar to the facts here, the underlying premise for the respective searches was wholly different.

¶27 We "must, necessarily, acknowledge the reality of the times in which we live." *Pastos*, 269 Mont. at 48, 887 P.2d at 202. The "reality of violence and potential for violence in our society" that we acknowledged over twenty years ago has become more immediate and pronounced in the intervening years. The *Pastos* Court's observation that "sadly, no citizen or property is, today, immune from attack by the deranged, the disaffected, the misguided, the terrorist or the zealot," *Pastos*, 269 Mont. at 48, 887 P.2d

13

at 202, especially applies to our post-September 11th world. However, safety concerns are not the only reason to uphold *Pastos*. From a procedural standpoint, we deem a standardized inventory search procedure applied uniformly to each arrestee who arrives at the station preferable to an ad hoc analysis by the officer on duty of every arrestee who comes through the door. An assessment of each person for the possible risk he or she might pose would by necessity be quick and subjective, and quite possibly wrong. Such an approach could also prompt complaints of selective enforcement or even bias. The routine procedure alleviates these issues, provides guidance to the officers assigned to perform the inventory search, and protects against allegations of theft or destruction of property. For all these reasons, we reaffirm our decision in *Pastos*.

## CONCLUSION

¶28 For the foregoing reasons, we affirm the District Court's denial of Demontiney's motion to suppress and dismiss.

/S/ PATRICIA COTTER

We concur:


/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JIM RICE
/S/ BRAD NEWMAN
District Court Judge Brad Newman
Sitting in for former Justice Brian Morris

14

Justice Michael E Wheat dissents.

¶29    I respectfully dissent.  Twenty years ago, *Pastos* provoked separate dissents from Chief Justice Gray, Justice Trieweiler, and Justice Hunt.  All three dissents exposed different flaws in the reasoning of *Pastos*: that it accepted alarmism and anxiety for a compelling state interest, *Pastos*, 269 Mont. at 58, 887 P.2d at 209 (Trieweiler, J., dissenting) ("The majority opinion . . . is that a compelling state interest can be established based on the majority's interpretation of what they see on the evening news."); that the Court misinterpreted the plain meaning and precedent of Montana's right to privacy, *Pastos* 269 Mont. at  64-65, 887 P.2d at 212 (Gray, C.J., dissenting); that the Court's flawed reasoning could easily swallow the right to privacy, *Pastos*, 269 Mont. at 66, 887 P.2d at 213 (Hunt, J., dissenting) ("This is another very long step down the road to making Article II, Sections 10 and 11 . . . worthless.").  I see the same flaws in today's Opinion.  I would return to our holding in *Sierra* that a search must employ the least intrusive means to serve a compelling state interest that is evidenced by the facts and circumstances of the case.

## A.  The Meaning of Article II, § 10 of the Montana Constitution

¶30    Article II, Section 10 of the Montana Constitution states:  "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

¶31    The heart of this case is the true meaning of the phrase "without the showing of a compelling state interest."  The plain meaning of "showing" is "the act or an instance of establishing through evidence and argument; proof."  *Black's Law Dictionary* 1413

15

(Bryan A. Garner ed., 8th ed., West 2007). A showing, therefore, is not an assumption or a theory that is accepted as true without proof. Rather, a showing involves some reliance on both argument and evidence to establish or prove a certain thing.

¶32 Section 10 requires specific facts and circumstances to justify a search, and that requirement is well established in this Court's precedent. We have interpreted Section 10 to require a totality of the circumstances evaluation of the specific situation in every other search context; for search warrants, *State v. Barnaby*, 2006 MT 203, ¶ 46, 333 Mont. 220, 142 P.3d 809; for searches incident to arrest, *State v. Cooney*, 2006 MT 318, ¶¶ 14-17, 335 Mont. 55, 149 P.3d 554; *Hardaway*, ¶¶ 58-60 ("Under these facts, there were simply no exigent circumstances requiring a warrantless search, and the search conducted was not necessary to guarantee any of the safeguards underlying § 46-5-102, MCA."); for consent to search, *State v. Clark*, 2008 MT 419, ¶¶ 27-28, 347 Mont. 354, 198 P.3d 809 ("The inquiry is dependent upon the facts and circumstances. . . . Indeed, it is possible that, under certain circumstances, even the owner of property will not have authority to consent to a search."); and for searches based on any exigent circumstances. *State v. Stone*, 2004 MT 151, ¶ 18, 321 Mont. 489, 92 P.3d 1178. Inventory searches, then, are an outlier among our decisions.

¶33 This interpretation of Section 10 was established long before *Pastos*. Even when *Pastos* was decided, Chief Justice Gray noted that its rationale "fails to focus on the individual nature of the right to privacy" and "takes into account neither the nature of the item being searched nor the nature of the reason for the arrest." *Pastos*, 269 Mont. at 64-65, 887 P.2d at 212-13 (Gray, C.J., dissenting). Alaska and Hawaii frame their

16

privacy rights in nearly identical language to our own. Haw. Const. art. I, § 6[1]; Alaska Const. art. I, § 22.[2] Both states rejected inventory searches in the 1970s on the grounds that "each case of search and seizure without a warrant must turn on its own facts," *State v. Kaluna*, 520 P.2d 51, 60 (Haw. 1974), and that officers "may not further search the arrestee's possessions . . . in the absence of a warrant or circumstances which provide the basis for a more intensive search under another recognized exception to the warrant requirement." *Reeves v. State*, 599 P.2d 727, 736 (Alaska 1979).

¶34 It is evident that Section 10 was drafted with the purpose to require case-by-case evaluation of specific facts and circumstances justifying the search at issue. The delegates had a major concern that a "compelling state interest" would be so broadly construed that it would consume the right of privacy. Delegate George Harper (Harper) sought to amend Section 10 to exclude the phrase "because that may be interpreted by whatever state agency happens to have an interest in invading my privacy at that particular time." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1682. The delegates approved that amendment, but later became concerned that the lack of "compelling state interest" would create confusion in this Court. Delegate Thomas Ask (Ask) reassured the delegates that their concerns were better addressed by including the language; "[b]y putting these words in, we're giving direction to the court how they are going to interpret this. If there's no compelling state interest, you can't invade a person's right of privacy. And this is going to have to be shown, and this is the

---

[1] "The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest."
[2] "The right of the people to privacy is recognized and shall not be infringed."

17

direction to the court." Verbatim Transcript, March 9, 1972, p. 1851. During the debate over whether a ban on wiretapping should be included in Section 11, the delegates concluded that wiretapping may be required "in matters involving certain heinous federal crimes where the situation is such that *in those instances* we must risk the right of individual privacy because there is a greater purpose to be served." Transcripts, p. 1687 (emphasis added). The delegates did not think that wiretapping should be allowed based on the inherent risk that anyone could commit a heinous federal crime, but rather, based on specific situations where heinous crime was involved. Section 10 means, and was intended to mean, that "showing of a compelling state interest" is a limited, case-by-case examination of the specific interest asserted.

¶35   This is where *Pastos* and the Court err. Privacy cannot be infringed simply because a compelling state interest may exist in some other instance. Instead, privacy may be infringed only when a compelling state interest is shown or proven under the totality of the circumstances of the instant situation. That "showing" requires reliance on both argument and evidence. The inventory search here was not based on evidence that Demontiney was violent or carried a dangerous explosive, and the police here had no reason to fear any of the fears of today's majority. Instead, the search is based on the broad assumption that anyone, in any circumstance, could use a concealed gun or explosive against police after or during incarceration. That remote risk may be based on argument, but it lacks evidence based in the facts and circumstances in this case. Nor can I find proof of that risk *in general*, and the majority cites to none. News stories about violence in our country are heart-wrenching, but they are not a blanket excuse for

18

abridging the right to privacy under Section 10's plain meaning, or its original intent, or our precedent.

¶36 As a final matter, the Court cites to recently decided federal law for the proposition that an arrestee has a privacy interest in her belongings, but that those interests are "diminished." Opinion, ¶ 12 (citing *Maryland v. King*, ___ U.S. at ___, 133 S. Ct. at 1978). We have consistently distinguished federal Fourth Amendment jurisprudence from the stronger protections embodied in Section 10. *King*'s "diminished" expectation directly contradicts our holding that "an arrestee has an expectation of and constitutional right of privacy in the personal property on his or her person or in his or her possession while at the police station." *Pastos*, 269 Mont. at 52, 887 P.2d at 204 (the only exception to this privacy interest is a compelling state interest). Perhaps unsurprisingly, we have previously rejected a search based on the same facts as *King*, holding that a defendant *does* have a reasonable expectation of privacy during his arrest. *See Hardaway*, ¶¶ 57-60 (swabbing for DNA was an impermissible search, as no circumstances justified the search and arrestee had reasonable expectation of privacy).

## B.    Less Intrusive Means

¶37 The majority declines to adopt the "less intrusive means" requirement for an inventory search, reciting the same objections to the least-intrusive means requirement as in *Pastos*. Opinion, ¶ 16. First, the majority fears that an arrestee can easily retrieve and use a weapon upon being released from incarceration. The risk is very remote that a random arrestee will be released from incarceration, receive her items, and immediately

use those items in a violent attack on police.[3] But even if that risk were significant, why does that logic not apply to searches incident to arrest? There, police must observe "circumstances that would cause a reasonable person to believe that prompt action was necessary to prevent physical harm to police" before conducting a search on an arrestee. *Hardaway*, ¶¶ 40-41 (quoting *Elison*, ¶ 56). Certainly, officers are more at risk of having a gun pulled on them while conducting an arrest, where they are often alone or outnumbered by their arrestees and the arrestee has a chance of escape through violence. *See Cooney*, ¶ 16. But even in this situation of heightened danger, we require a search to be based on specific facts and circumstances. Yet, in a less dangerous situation back at the station, we require no articulation of any facts, circumstances, or danger. I cannot understand how we see a danger in one situation but not the other; dangerous items in an arrestee's possession do not become more dangerous after she is separated from them, processed and incarcerated.

¶38 The contradiction is further highlighted by *State v. Graham*, 271 Mont. 510, 898 P.2d 1206 (1995), a case factually indistinguishable from this case. There, an individual was arrested and separated from her purse, but the officer later retrieved the purse and performed a search incident to arrest because the purse had been in her grab area at the time of arrest. *Graham*, 271 Mont. at 512-13, 898 P.2d at 1207. We prohibited that search because Graham had been separated from her purse, and therefore, there was no

---

[3] As counsel for Appellant points out, many arrestees are more than happy to be released from incarceration, and are more likely to feel relief rather than anger or vengeance. It is during the arrest itself that the arrestee is more likely to use violence in an attempt to escape police.

20

interest in protecting the police officer, preventing the destruction of evidence, or otherwise. *Graham*, 271 Mont. at 513, 898 P.2d at 1208. But, under *Pastos*, the same search would have been valid if the officer had waited until he was at the station. In two factually indistinguishable cases, we see an opposite result depending on what search warrant exception is applied.

¶39 Second, the majority relies on an even more remote possibility of an even greater danger; that the arrestee has an explosive or incendiary device in her purse. The majority notes that, since the horrific events of September 11, 2001, this concern is even more pronounced today than when *Pastos* was decided. Again, does the remote possibility of terrorism justify a search of a purse incident to arrest? Or does the pervasive anxiety of 9-11 limit itself to the inventory rooms of police stations? In any event, we have specifically rejected that a "remote possibility of harm" justified "a general search of the wallet for weapons, explosives or hazardous material" in *Hamilton*, ¶ 39. The majority distinguishes *Hamilton* on the grounds that there was no risk of Hamilton pulling a gun out of the lost container. Opinion, ¶ 23. But surely, an angry possessor could use a gun in her lost purse just as easily as she could use a gun in her seized purse, and a terrorist could just as easily place a bomb in either. The difference between a lost and seized purse is simply a distinction without a difference. The majority also distinguishes *Hamilton* because the defendant was separated from her wallet and could not access it for a weapon. That is precisely the case here; Demontiney was separated from her purse upon her arrest, she never regained control over it, and neither the District Court nor the

21

officers involved believed that the purse posed any danger, explosive or otherwise. The only possible inference of danger in this situation comes from this Court.

¶40 Next, the Court cites to *Lafayette* to hold that police must protect themselves from the arrestee's false claims of stolen property, and that the arrestee's property is also protected from theft by police. How does the inventory search procedure protect either of those interests? A corrupt officer could easily leave a stolen item off the list of items in inventory, and a lying arrestee could just as easily fabricate allegations of stolen property. In any event, "[t]he government's interest in protecting itself against fraudulent post-incarceration claims of loss or damage to property is at best a tenuous reason for infringing the privacy of an individual's belongings . . . . To the extent that the basic purposes of an inventory search can be accomplished by means which are less intrusive on an internee's privacy, then the constitutional rule of reason requires such means to be employed." *Kaluna*, 520 P.2d at 61 (citations omitted).

¶41 Finally, the majority claims that inventory searches *are* the less intrusive means to combat any danger and preserve property, reasoning that "it is impractical and unreasonable" for police to assess threats on a case-by-case basis, Opinion, ¶ 16, and that such a threat assessment would be "quick and subjective, and quite possibly wrong." Opinion, ¶ 27. I would give more credit to our officers of the law. Police officers constantly make fact-based legal judgments about reasonable suspicion, probable cause, and exigency. In fact, we already demand that our officers employ this less intrusive means requirement when conducting an inventory search of a lost item. *Hamilton*, ¶ 42. Nor is the majority's concern supported by the experiences of other states; the police of

22

Hawaii and Alaska also operate under this standard and have effectively incorporated it into their policies for more than thirty years. In these states, the simple method for preventing illicit or dangerous objects from entering the prison is to (1) search the arrestee's person for any objects, (2) separate the arrestee from any repositories in her possession, and (3) place all objects and repositories into an evidence bag and store them until the arrestee is released. *See Kaluna*, 520 P.2d at 61. This "bag it, tag it" method prohibits the arrestee from bringing weapons or drugs into prison, protects the police from any exposure to hazardous chemical or biological agents, protects the arrestee's property, and shields the police from false claims. The compelling interests asserted, if they are compelling at all, are well served by the less intrusive "bag-it tag-it" method. The majority overcomplicates a procedure that has previously existed in Montana and currently exists elsewhere.

¶42 The more subjective, unreasonable, and wrong method would be the type of search permitted by the majority. The officer testified that "[w]e search everybody's property or purse" and the containers inside, without regard to the item's size or nature. It is the officer's unfettered discretion to root through a purse, an opaque sandwich container inside the purse, and any other container or object no matter its propensity for danger. Upon finding a phone, a device which is commonly used as a detonator for improvised explosives, the officer could search its contents on the grounds that a vengeful arrestee will detonate an explosive upon her release. Had the sandwich container actually contained a sandwich, the officer could search the sandwich on the remote possibility that it contains a bomb or gun. The majority requires no evaluation of facts and

23

circumstances, only a vivid imagination, so it is the officer's unlimited discretion which objects ought to be searched and the scope of that search, without any evaluation of danger whatsoever. This standard is more subjective, unreasonable, and prone to bias and misuse than the simple "bag it, tag it" method employed in Hawaii and Alaska.

## C. *Stare Decisis*

¶43 The majority invokes *stare decisis* in support of *Pastos*. The irony is that *Pastos* itself was major departure from our Section 10 jurisprudence. *See Sierra*, 214 Mont. at 477, 692 P.2d at 1275; *State v. Sawyer*, 174 Mont. 512, 518, 571 P.2d 1131, 1134 (1977). "*Stare decisis* is the preferred course because it promotes evenhanded, predictable, and consistent development of legal principles . . . ." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991). Conversely, *stare decisis* is unwarranted when a given decision is applied unpredictably, unevenly, or is inconsistent with developing legal principles.

¶44 *Pastos* has wreaked havoc in our Section 10 jurisprudence. In *Hamilton*, the Court recognizes the error in reasoning, and limits *Pastos* to its facts while asserting that "the Constitution does not allow a general search of a benign object based on such a remote possibility of harm . . . ." *Hamilton*, ¶¶ 37-39. This Court now tries to reconcile *Pastos* and *Hamilton* by distinguishing the inherent danger of lost items from the inherent danger of seized items; a distinction without a difference. Six years after writing *Pastos*, even its author confusingly minimized and distinguished that decision's handling of the less intrusive means requirement. *See Deserly v. Department of Corrections*, 2000 MT 42, ¶ 44, 298 Mont. 328, 995 P.2d 972 ("[W]e have adopted a 'less intrusive means rule' in

24

the context of inventory search cases."). We are not the only jurists struggling with this decision, as the District Court also felt that the application of *Pastos* was disingenuous, unreasonable, and inequitable under the circumstances in this case. Finally, the blanket searches in *Pastos* are gradually creeping into other privacy protections. We have previously rejected an overbroad search incident to arrest when it was not based on sufficient facts and circumstances. *Hardaway,* ¶¶ 58-59; *Galpin*, ¶ 56. Yet in more recent precedent we have allowed an overbroad search incident to arrest *because* the arrestee would inevitably be subjected to an inventory search. *State v. Hilgendorf*, 2009 MT 158, ¶¶ 25-27, 350 Mont. 42, 208 P.3d 401.

¶45 *Pastos* is troublesome to lower courts, it is applied inconsistently in our own precedent, and its reasoning is slowly eroding the privacy protections in our jurisprudence; these are the symptoms of a decision in distress. The interests promoted by adhering to *stare decisis* are the very interests that require overturning *Pastos*. That decision and its doctrine of fact-blind, categorical justifications in our warrant exceptions have been stretched far beyond their breaking points. *Thornton v. United States*, 541 U.S. 615, 625, 124 S. Ct. 2127, 2133 (2004) (Scalia, J., concurring). It is time to leave behind anxiety and alarmism in our legal reasoning, and replace it with an objective and realistic examination of facts as required by Section 10.

/S/ MICHAEL E WHEAT